UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                                **'O'**

| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

Present: The Honorable          CHRISTINA A. SNYDER

| Catherine Jeang | Not Present | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys Present for Plaintiffs:                    Attorneys Present for Defendants:

Not Present                                                         Not Present

**Proceedings:**      (IN CHAMBERS) – REDACTED PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (Dkt. [ 105 ], filed June 1, 2020)

## I.      INTRODUCTION

Plaintiff Hope Medical Enterprises, Inc. ("Hope") filed this action against defendants Fagron Compounding Services, LLC ("Fagron"), JCB Laboratories, LLC ("JCB"), AnazaoHealth Corporation ("AnazaoHealth"), and Coast Quality Pharmacy, LLC ("Coast") (collectively, "defendants") on September 6, 2019.  Dkt. 1.  The gravamen of Hope's claims is that defendants' drug compounding practices constitute unfair competition in violation of several states' consumer protection laws.

On September 27, 2019, Hope filed a motion for a preliminary injunction.  Dkt. 22.  Hope subsequently filed a superseding amended motion for a preliminary injunction on October 21, 2019.  Dkt. 38.  On November 4, 2019, the parties filed a joint stipulation allowing Hope to withdraw its pending preliminary injunction motion.  Dkt. 42.  The Court entered the parties' joint stipulation on November 2019, allowing Hope to withdraw its pending preliminary injunction motion without prejudice and granting Hope leave to file a first amended complaint.  Dkt. 46.

Hope thereafter filed the operative first amended complaint on November 12, 2019.  Dkt. 47 ("FAC").   The FAC asserts claims for: (1) violation of California's Unfair Competition Law ("UCL"); (2) violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"); (3) violation of Tennessee's Consumer Protection Act ("TCPA"); (4) violation of South Carolina's Unfair Trade Practices Act ("SCUTPA"); and (5) violation

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | ‘O’ |
|---|---|---|---|
| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

of Connecticut's Unfair Trade Practices Act ("CUTPA").  See generally FAC.  Defendants filed their operative amended answer on January 27, 2020.[1]  Dkt. 67.

Hope filed the present motion for a preliminary injunction on June 1, 2020.  Dkt. 105 ("Mot.").  Defendants filed an opposition on June 8, 2020.  Dkt. 113 ("Opp.").  Hope filed a reply on June 15, 2020.  Dkt. 122 ("Reply").

The Court held a hearing on June 29, 2020.  Having carefully considered the parties' arguments, the Court finds and concludes as follows.

## II.    BACKGROUND

### A.    Regulatory Framework Governing Drug Compounding

At issue in this case are defendants' drug compounding practices.  "Drug compounding is a process by which a pharmacist or doctor combines, mixes, or alters ingredients to create a medication tailored to the needs of an individual patient."  Thompson v. W. States Med. Ctr., 535 U.S. 357, 360–61 (2002).  "Compounding is typically used to prepare medications that are not commercially available, such as medication for a patient who is allergic to an ingredient in a mass-produced product."  Id.  "Many States specifically regulate compounding practices as part of their regulation of pharmacies."  Id.

The manner in which states and the federal government have regulated drug compounding has changed over time, and Hope's claims turn on the legality of defendants' drug compounding practices.  Accordingly, the Court briefly sets forth both the regulatory framework governing drug compounding and its history.

#### 1.    Congress Enacts the Federal Food Drug and Cosmetic Act of 1938

In 1938, Congress enacted the Federal Food Drug and Cosmetic Act of 1938 ("FDCA") "to regulate drug manufacturing, marketing, and distribution."  Med. Ctr. Pharmacy v. Mukasey, 536 F.3d 383, 388 (5th Cir. 2008).  The FDCA provides that "[n]o person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application . . . is effective with respect to such drug."  21 U.S.C. §

---

[1]    On January 13, 2020, the Court granted in part and denied in part Hope's motion to strike and for judgment on the pleadings as to affirmative defenses in defendants' prior answer to the FAC.  Dkt. 66.  Defendants thereafter filed their operative amended answer.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

355(a). The FDCA defines "new drug" as "[a]ny new drug . . . the composition of which is such that such drug is not generally recognized . . . as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof[.]" 21 U.S.C. § 321(p)(1). "The FDCA invests the Food and Drug Administration (FDA) with the power to enforce its requirements." Thompson, 535 U.S. at 362.

"To be deemed 'safe and effective' and thereby obtain FDA approval, a new drug must undergo an extensive application and approval process." Med. Ctr. Pharmacy, 536 F.3d at 388. The FDCA requires that any FDA finding of "'safe and effective' must be based on 'substantial evidence' of expert consensus." Id. "The 'test is rigorous,' requiring expensive and time-consuming clinical trials[.]" Id. at 388–389.

### 2. The FDA Historically Leaves Regulation of Compounding to the States

"For approximately the first 50 years after the enactment of the FDCA, the FDA generally left regulation of compounding to the States." Thompson, 535 U.S. at 362. Indeed, "the FDA as a matter of policy has not historically brought enforcement actions against pharmacies engaged in traditional compounding." Professionals & Patients for Customized Care v. Shalala, 56 F.3d 592, 593 n.3 (5th Cir. 1995). During this period, "[p]harmacists continued to provide patients with compounded drugs without applying for FDA approval of those drugs." Thompson, 535 U.S. at 362. "In the early 1990's, however, the FDA became concerned that some pharmacies were purchasing bulk quantities of drug products, 'compounding' them into specific drug products before receiving individual prescriptions, and marketing those drugs to doctors and patients." Med. Ctr. Pharmacy, 536 F.3d at 389. The FDA ultimately came to believe "that some pharmacists were manufacturing and selling drugs under the guise of compounding, thereby avoiding the FDCA's new drug requirements." Thompson, 535 U.S. at 362.

### 3. Congress Enacts the Drug Quality and Security Act in 2013

In 2013, "Congress passed new legislation that once again created federal regulatory power over compounding pharmacies."[2] Cruz v. Preferred Homecare, No. 2:14-cv-00173-

---

[2] In 1997, Congress passed the Food and Drug Administration Modernization Act ("FDAMA"), "which explicitly gave the FDA limited regulatory power over compounding pharmacies." Cruz, 2014 WL 4699531, at *3. In 2002, however, the United States Supreme Court in Thompson struck down particular provisions of the FDAMA as

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| CIVIL MINUTES – GENERAL | | 'O' | |
|---|---|---|---|
| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

MMD, 2014 WL 4699531, at *3 (D. Nev. Sept. 22, 2014). This legislation—the Drug Quality and Security Act ("DQSA")—"amend[ed] FDCA Section 503A and add[ed] Section 503B."[3] Allergan USA Inc. v. Imprimis Pharm., Inc., No. 8:17-cv-01551-DOC-JDE, 2017 WL 10526121, at *2 (C.D. Cal. Nov. 14, 2017).

### a.   Section 503A of the FDCA

Section 503A regulates "pharmacy compounding." See 21 U.S.C. § 353a. "Drug products compounded 'for an identified individual patient that are necessary for the identified patient' are exempted from normal-drug approval requirements under Section 503A when certain conditions are met." Imprimis, 2017 WL 10526121, at *2 (internal alterations omitted) (citing 21 U.S.C. § 353a(a)). Accordingly, "Section 503A allows pharmacy compounding in two scenarios: (1) drug compounding after the receipt of a prescription; and (2) drug compounding before the receipt of a prescription when the compounding is 'based on a history of receiving valid prescription orders for the compounding of the drug product, which orders have been generated solely within an established relationship between' the compounding pharmacy and the patient or prescribing physician." Imprimis, 2017 WL 10526121, at *2 (internal alterations omitted) (citing 21 U.S.C. § 353a(a)).

"In both scenarios, Section 503A also requires that the compounded drug is (1) compounded using approved drug products; (2) compounded using ingredients that comply with national standards; (3) not compounded 'regularly or in inordinate amounts (as defined by the Secretary)' if the compounded drug is 'essentially a copy of a commercially available product'; (4) not a drug product whose safety or effectiveness may be adversely effected by compounding; and (5) compounded in a state that has entered into a

---

unconstitutional, and the FDA subsequently "took the position that all of the FDAMA is now invalid." Med. Ctr. Pharmacy, 536 F.3d at 391 (internal alteration omitted). "Thus, between 2002 and November 2013, there was no federal statute in effect that expressly provided for the FDA to regulate compounding pharmacies." Cruz, 2014 WL 4699531, at *3.

[3]   Congress enacted the DQSA following a 2012 incident wherein a drug compounding center "produced contaminated injections that caused a meningitis outbreak, killing more than 60 people and infecting hundreds more." Athenex Inc. v. Azar, 397 F. Supp. 3d 56, 59 (D.D.C. 2019).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

'Memorandum of Understanding' ('MOU') with the FDA or, if no such MOU exists for that state, compounded by a pharmacy or individual that distributes less than '5 percent of its total prescription orders' to out-of-state patients." Imprimis, 2017 WL 10526121, at *2 (internal alterations omitted) (citing 21 U.S.C. § 353a(b)).

b.      **Section 503B of the FDCA**

"Section 503B created a new category of drug maker called an 'outsourcing facility.'" Athenex, 397 F. Supp. 3d at 59 (citing 21 U.S.C. § 353b). "An outsourcing facility may compound drug products in large quantities without obtaining a prescription for 'an identified individual patient.'" Athenex, 397 F. Supp. 3d at 59 (internal alteration omitted) (citing 21 U.S.C. § 353b). Accordingly, outsourcing facilities "are permitted to sell bulk compounded drug products to health care practitioners and hospitals as 'office stock,' for providers to have available and to use on an as-needed basis." Athenex, 397 F. Supp. 3d at 59.

Pursuant to Section 503B, "[a]n outsourcing facility remains exempt from the FDCA's premarket approval requirements and certain labeling and supply-chain requirements, but only if it satisfies eleven statutory criteria." Athenex, 397 F. Supp. 3d at 59 (internal citations omitted). These criteria include, *inter alia*, requirements that: "(1) the drug is not 'essentially a copy of one or more approved drugs;' (2) the drug is not sold wholesale; and (3) the 'drug is compounded in an outsourcing facility in which the compounding of drugs occurs only in accordance with Section 503B.'" Imprimis, 2017 WL 10526121, at *2 (internal alterations omitted) (citing 21 U.S.C. § 353b(a)). In addition, Section 503B "specifically limits the types of drugs that can be compounded at outsourcing facilities" to those "compound bulk drug substances that appear on (1) a list established by the FDA identifying bulk drug substances for which there is a clinical need ('503b bulks list'); or (2) a drug shortage list established by the FDA." Imprimis, 2017 WL 10526121, at *2 (internal alterations omitted) (citing 21 U.S.C. § 353b(a)(2)(A)).

B.      **Hope's Sodium Thiosulfate Drugs**

Hope is a pharmaceutical manufacturer that sells pharmaceutical products including a sodium thiosulfate injection and a sodium nitrite injection. FAC ¶ 26. Hope alleges that it "is the exclusive supplier of FDA-approved Sodium Thiosulfate Injection sold in the United States." Id. Similarly, "Hope is the only supplier of bulk sodium thiosulfate that has been approved by [the] FDA for use as an active ingredient in medications that are intended for administration to humans." Id. ¶ 43. Bulk sodium thiosulfate is the active

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

ingredient in Hope's Sodium Thiosulfate Injection, and "Hope's Sodium Thiosulfate Injection has been approved by [the] FDA for the treatment of acute cyanide poisoning that is judged to be serious or life-threatening." FAC ¶¶ 28, 38.

### C.    Defendants' Alleged Compounding Practices

Hope alleges that defendants "are owned either directly or indirectly by Fagron BV, a company registered in Belgium, and/or its affiliate, Fagron NV, a company registered and headquartered in the Netherlands." FAC ¶ 13.  According to Hope, defendants "are under common ownership and control and work closely together" in "creating, marketing, and selling unapproved new drugs for unapproved uses . . . under the false guise of 'compounding.'" Id. ¶¶ 11, 13. In particular, Hope avers that defendants sell compounded sodium thiosulfate, which does not contain potassium, for the "off-label use" of treating "calciphylaxis, a painful condition suffered by some end stage renal disease patients." Mot. at 7 n.4.

Fagron, JCB, and AnazaoHealth own outsourcing facilities that purport to operate pursuant to Section 503B. FAC ¶ 14. Hope alleges that defendants' outsourcing facilities are engaged in compounding that violates Section 503B's eleven statutory criteria. Id. ¶¶ 71–72.  Coast owns and operates a compounding pharmacy that "purports to operate" pursuant to Section 503A. FAC ¶ 14. According to Hope, however, Coast violates Section 503A because "Coast does not compound or dispense its compounded sodium thiosulfate product based on the need for an alternative to an FDA-approved drug or dispense its compounded sodium thiosulfate drug product based on the receipt of a prescription order (or a prescriber's notation on the order) specifying that (a) a compounded sodium thiosulfate drug product is necessary for the identified patient and (b) the patient's needs cannot be met by an FDA-approved drugs." Id. ¶ 77. "Coast therefore does not comply with Section 503A's individual customization requirement." Id. Hope further alleges that Coast violates Section 503A in that Section 503A requires "that drug products that are essentially copies of a commercially available drug product must not be compounded regularly or in inordinate amounts." Id. ¶ 79. Nonetheless, "[d]efendants' compounded sodium thiosulfate drug product is essentially a copy of Hope's . . . in that the two drugs have the same active pharmaceutical ingredient, in the identical dosage strength, with the same route of administration" and "[d]efendants are compounding their sodium thiosulfate drug products regularly and in inordinate amounts." Id.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**       **'O'**

| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
|---|---|---|---|
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

## III.   LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). The Ninth Circuit summarized the Supreme Court's clarification of the standard for granting preliminary injunctions in Winter as follows: "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Am. Trucking Ass'n, Inc. v. City of Los Angeles, 559 F.3d 1046, 1052 (9th Cir. 2009); see also Cal. Pharms. Ass'n v. Maxwell-Jolly, 563 F.3d 847, 849 (9th Cir. 2009). A preliminary injunction, moreover, may only be awarded "upon a clear showing" of evidence that supports each relevant preliminary injunction factor. Winter, 555 U.S. at 22. Alternatively, "'serious questions going to the merits' and a hardship balance that tips sharply towards the plaintiff can support issuance of an injunction, so long as the plaintiff also shows a likelihood of irreparable injury and that the injunction is in the public interest." Alliance for the Wild Rockies v. Cottrell, 622 F.3d 1045, 1053 (9th Cir. 2010). Serious questions are those "which cannot be resolved one way or the other at the hearing on the injunction." Bernhardt v. Los Angeles Cty., 339 F.3d 920, 926 (9th Cir. 2003) (citation omitted).

## IV.   DISCUSSION

### A.   Requests for Judicial Notice and Evidentiary Objections

The Court observes that each party has filed one or more requests for judicial notice, and the parties have lodged evidentiary objections to the documents that the parties submit in support of their respective briefs. See, e.g., Dkts. 106 ("Hope RJN"), 114 ("D. RJN"), 114 ("D. Opp. to Hope RJN"), 123 ("Hope Supp. RJN"); 125 ("Hope Evidentiary Objections"). However, "[i]t is well established that trial courts may consider otherwise inadmissible evidence in preliminary injunction proceedings." Garcia v. Green Fleet Sys., LLC, No. 2:14-cv-06220-PSG-JEM, 2014 WL 5343814, at *5 (C.D. Cal. Oct. 10, 2014). "Indeed, district courts have considerable discretion to consider otherwise inadmissible evidence when ruling on the merits of an application for a preliminary injunction." Id.

The Court notes that "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981); accord Johnson v. Couturier, 572 F.3d 1067, 1083 (9th Cir. 2009); Flynt Distrib. Co. v. Harvey, 734 F.2d

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| CIVIL MINUTES – GENERAL | | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

1389, 1394 (9th Cir. 1984). Accordingly, evidentiary objections to evidence submitted in connection with a motion for a preliminary injunction "properly go to weight, rather than admissibility." Garcia, 2014 WL 5343814, at *5. Similarly, even if evidence "do[es] not meet the requirements for judicial notice," the Court may consider the evidence "in the context of the preliminary injunction motion and give [the evidence] appropriate weight[.]" Walker v. Woodford, 454 F. Supp. 2d 1007, 1024 (S.D. Cal. 2006).

The Court has considered the parties' requests for judicial notice and the parties' evidentiary objections. To the extent that the parties' respective requests for judicial notice seek judicial notice of the *existence* of particular documents, the Court **GRANTS** the parties' requests for judicial notice. The Court **DENIES** the parties' requests for judicial notice in all other respects. In addition, where the Court has expressly relied on evidence that is subject to an evidentiary objection, the Court **OVERRULES** those objections.

### B.    Likelihood of Success

Hope's state-law consumer protection claims are predicated on defendants' alleged violations of Sections 503A and 503B. See Mot. at 15. Accordingly, to determine whether Hope is likely to succeed on the merits of Hope's claims, the Court first considers Hope's arguments that defendants have violated Sections 503A and 503B. The Court next considers arguments specific to Hope's particular consumer protection claims.

#### 1.    Section 503A

Hope argues that "[d]efendants' compounding practices violate two separate provisions of section 503A: (1) the 'essentially a copy' provision"; and "(2) the 'individual prescription' requirement[.]" Mot. at 15. The Court addresses Hope's contention in turn.

#### a.    "Essentially a Copy" Requirement

Pursuant to Section 503A, "[a] drug product may be compounded if the licensed pharmacist or licensed physician . . . does not compound regularly or in inordinate amounts (as defined by the Secretary) any drug products that are essentially copies of a commercially available product." 21 U.S.C. § 353a(b)(1)(D). "This means that a compounded drug product is not eligible for the exemptions in Section 503A if it is (1) essentially a copy of a commercially available drug product, and (2) compounded regularly

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

or in inordinate amounts."[4]   Dkt. 106-1, Exh. C, Food and Drug Administration, <u>Compounded Drug Products That Are Essentially Copies of a Commercially Available Drug Product Under Section 503A of the Federal Food, Drug, and Cosmetic Act: Guidance for Industry</u> (Jan. 2018) ("FDA Guidance on 503A 'Essentially a Copy' Requirement") at 4.  "The term 'essentially a copy of a commercially available drug product' does not include a drug product in which there is a change, made for an identified individual patient, which produces for that patient *a significant difference*, as determined by the prescribing practitioner, between the compounded drug and the comparable commercially available drug product." 21 U.S.C. § 353a(b)(2) (emphasis added).  "If a compounder intends to rely on such a determination to establish that a compounded drug is not essentially a copy of a commercially available drug product, the compounder should ensure that the determination is documented on the prescription."   FDA Guidance on 503A "Essentially a Copy" Requirement at 8.

Here, Hope first argues that defendants violate Section 503A's "essentially a copy" requirement because defendants' "compounded sodium thiosulfate drug is essentially a copy of Hope's" product since "it has the same API as Hope's Sodium Thiosulfate [injection], the identical dosage strength, and the same route of administration (intravenous injection)." Mot. at 16.  In support of this argument, Hope submits the declaration of Dr. Craig Sherman, Hope's President, who attests to the characteristics of Hope's products, <u>see</u> dkt. 105-3 ("Sherman Decl.") ¶ 9, as well as a copy of defendants' prescription order form, which indicates that defendants' sell sodium thiosulfate for intravenous use, <u>see</u> dkt. 105-4, Exh. B.

In response, defendants argue that their compounded "product is not essentially a copy of [Hope's] because [d]efendants' product does not contain potassium while [Hope's] does." Opp. at 12.  According to defendants, "[t]his a very important distinction." <u>Id.</u> at 2.  In support of defendants' argument that its compounded product is not essentially a copy of Hope's product, defendants submit letters from Dr. Jeffrey Hymes, the Chief Medical Officer of Fresenius Kidney Care and one of defendants' customers, who urges

---

[4]      A drug is compounded "regularly" if is "compounded at regular times or intervals, usually or very often."  FDA Guidance on 503A "Essentially a Copy" Requirement at 10. A drug is compounded in "inordinate amounts" if "it is compounded more frequently than needed to address unanticipated, emergency circumstances, or in more than the small quantities needed to address unanticipated, emergency circumstances." <u>Id.</u>

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**            **'O'**

| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
|----------|--------------------------|------|--------------|
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

that there is a "significant difference between the JCB/Fagron and Hope preparations" of sodium thiosulfate.  Dkt. 113-1, Exh. A.  Dr. Hymes indicates that "the Hope Pharmaceuticals product contains 4 milligrams of potassium per milliliter . . . [while] the Fagron product contains no potassium."  Id.  In another letter, Dr. Hymes explains that defendants' removal of potassium is "significant" because Fresenius Kidney Care uses defendants' compounded product for the off-label use of treating renal patients undergoing dialysis treatment who suffer from calciphylaxis, and for those patients suffering from renal failure, "control of potassium is a crucial function of dialysis" since exposure to potassium "can lead to cardiac arrythmia and death."  Id.  Similarly, defendants submit a letter from Dr. George Aronoff, the Vice President of Clinical Affairs for DaVita Kidney Care, another of defendants' customers, who indicates that "[o]ur preference from a clinical perspective is to use the STS compounded by JCB/Fagron because the commercially available 25 gram dose of STS provided by Hope Pharmaceuticals contains 880 mg of potassium."  Dkt. 113-1, Exh. B.

Hope disputes that defendants' compounding of sodium thiosulfate without potassium is a "significant difference," pointing to evidence that defendants' "customers purchase defendants' sodium thiosulfate drugs for purely financial reasons."  Mot. at 7.  For example, Dr. Sherman, Hope's President, attests that during a seven-month period between 2018 and 2019, Hope fulfilled orders from Fresenius and DaVita for Hope's sodium thiosulfate product, which contains potassium.  Sherman Decl. ¶¶ 16–21.  According to Hope, "[t]his establishes that [d]efendants' biggest customers believe that Hope's Sodium Thiosulfate Injection can satisfy their patients' medical needs, and that [d]efendants' compounded product does not produce a necessary or significant clinical difference."  Mot. at 8.  That is because these customers would not have purchased Hope's product if they "believed a compounded drug was medically necessary" and that "Hope's Sodium Thiosulfate Injection was inappropriate" for their patients.  Id.

The FDA's guidance indicates that Section 503A's "essentially a copy" requirements—as set forth in 21 U.S.C. § 353a(b)(1)(D)—"apply to the compounding of drug products that are *essentially* copies of a commercially available drug product – not only to drugs that are exact copies or even to drugs that are nearly identical."  FDA Guidance on 503A "Essentially a Copy" Requirement at 6 (emphasis in original).  The FDA explains that "[t]his is to ensure that compounders do not evade the limits in this section by *making relatively small changes* to a compounded drug product and then offering the drug to the general public without regard to whether a prescribing practitioner has determined that the change produces for the patient a significant difference."  FDA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**      **'O'**

| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
|---|---|---|---|
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

Guidance on 503A "Essentially a Copy" Requirement at 6 (emphasis added). The FDA further instructs that "for some patients, a drug product that has the same API, strength, and route of administration may include a change that produces a significant difference for a particular patient." Id. "For example, a drug product compounded without a particular inactive ingredient may produce a significant difference for a patient who has an allergy to the inactive ingredient in the commercially available drug product." Id. "However, for other patients, this change may produce no difference at all. Congress did not intend for compounders to use . . . the fact that some patients may have allergies as a basis to compound a drug without the inactive ingredient for other patients who do not have the allergy under the exemptions in section 503A[.] Id. Accordingly, the FDA "generally intend[s] to consider such a drug essentially a copy unless a prescriber determines that there is a change that will produce a significant difference for the patient for whom it is prescribed." Id. at 7.

The disputed record before the Court precludes the Court from determining, at this juncture, whether defendants' compounded sodium thiosulfate drug is "essentially a copy" of Hope's product, given that Hope's product contains potassium, while defendants' compounded product does not. However, the FDA's guidance indicates that "[i]f a compounder intends to rely on" a determination that its compounded drug contains a different formula from that of a commercially available drug product "to establish that a compounded drug is not essentially a copy of a commercially available drug product, the compounder should ensure that the determination is documented on the prescription." FDA Guidance on 503A "Essentially a Copy" Requirement at 8. The parties dispute whether defendants' compounded drugs contains the requisite "Significant Difference Statement."

Hope argues that defendants' "503A pharmacy fills prescriptions for compounded sodium thiosulfate drugs without requiring a Significant Difference Statement." Mot. at 11. Instead, defendants "simply ask doctors ordering through [d]efendants' website to certify that 'this compounded preparation is necessary for the patient(s) identified below.'" Id. Hope also points to a standard prescription form that defendants accept which contains a pre-printed statement that [REDACTED]. According to Hope, "[t]his statement is inadequate because (i) it is pre-printed on the form and is not an affirmative statement made by the prescribing practitioner, and (ii) the 'clinically necessary language' does not satisfy

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

Section 503A." Mot. at 11. Examples of defendants' website and [REDACTED] are pictured below:



Dkt. 105-4, Exh. E; [REDACTED].

In response, defendants argue that "[t]he FDA's Guidance under 503A regarding the 'Statement of Significant Difference' does not require a specific format to document the prescriber's determination." Opp. at 8. Defendants further assert that "[i]n response to discovery, [d]efendants have produced hundreds of individual prescriptions and orders containing attestations from medical providers for [d]efendants' potassium-free sodium thiosulfate for calciphylaxis patients, including order forms signed by pharmacy directors, registered nurses and clinical managers." Id. at 3; see also [REDACTED].

The FDA's guidance indicates that the FDA "does not believe that a particular format is needed to document the determination, provided that the prescription makes clear that the prescriber *identified the relevant change and the significant difference that the change will produce* for the patient." FDA Guidance on 503A "Essentially a Copy" Requirement at 8 (emphasis added). The FDA's guidance indicates that "the following would be sufficient:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | **CIVIL MINUTES – GENERAL** | | **'O'** |
|---|---|---|---|
| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

- 'No Dye X, patient allergy' (if the comparable drug contains the dye)
- 'Liquid form, patient can't swallow tablet' (if the comparable drug is a tablet)
- '6 mg, patient needs higher dose' (if the comparable drug is only available in 5 mg dose)"

FDA Guidance on 503A "Essentially a Copy" Requirement at 8.

Accordingly, the pre-formulated, generic statements on defendants' website and standard prescription forms that defendants accept from prescribers appear to be inadequate in that these statements do not require the prescribers to "make clear that the prescriber made the determination required by section 503A(b)(2)." FDA Guidance on 503A "Essentially a Copy" Requirement at 9. And while the FDA's guidance states that the FDA "generally does not intend to question prescriber determinations that are documented in a prescription or notation," it also indicates that "*we do intend to consider whether a prescription* or notation relied upon by a compounder to establish that a drug is not essentially a copy *documents that the determination was made.*" Id. (emphases added).

In support of its argument that it is likely to succeed on the merits of its claim that defendants violated Section 503A's "essentially a copy" requirement, Hope relies on Allergan USA Inc. v. Imprimis Pharm., Inc., No. 8:17-cv-01551-DOC-JDE, 2019 WL 3029114, (C.D. Cal. July 11, 2019). In that case, another court in the Central District of California issued a post-trial, permanent injunction in favor of Allergan, a pharmaceutical manufacturer, against Imprimis, a drug compounder, on the basis that Imprimis was engaged in unlawful compounding in violation of Sections 503A. Id. at *1. There, Imprimis used a "standard order form . . . for Section 503A orders" and "required that every order shipped from a Section 503A facility be accompanied by a written confirmation from the doctor or hospital or surgery center that the order is 'necessary for an individual patient and subject to a valid prescription.'" Id. at *9. The court determined that the standard order form "does not adequately distinguish a Section 503A drug as medically necessary where a FDA-approved drug is medically appropriate for the patient." Id. at *10. The court concluded that "[a] limited permanent injunction is therefore proper to ensure compliance with . . . Section 503A," explaining that Imprimis' standard "form would satisfy the injunction so long as it is adequately executed for an identified individual patient and specifies that (1) the *compounded* drug is medically necessary and (2) an FDA-

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

approved drug is not medically appropriate."[5]  Imprimis, 2019 WL 3029114, at *11 (emphasis in original).

To the extent that Hope claims that defendants violate Section 503A's "essentially a copy" requirement because defendants fulfill orders for their compounded sodium thiosulfate products without sufficient, affirmative determinations by prescribers that defendants' compounded products—as opposed to Hope's FDA-approved products—are necessary, Hope raises a likelihood of success on the merits.

### b.    Individual Prescription Requirement

Alternatively, Hope argues that "[d]efendants' 503A pharmacy does not compound sodium thiosulfate drugs for 'identified individual patients' with 'valid prescription orders.'"  Mot. at 16 (citing 21 U.S.C. § 353a(a)).  In response, defendants assert that their "503A facility sells [their] potassium-free sodium thiosulfate product pursuant to individualized prescriptions from treating physicians."  Opp. at 7.

In Imprimis, upon which Hope primarily relies, the court concluded, at the summary judgment stage, that "[u]nder the plain language of the statute, anticipatory mass compounding of standardized drugs in a 503A facility without identified individual patients based on valid prescription orders is clearly violative of the FDCA."  Allergan USA, Inc. v. Imprimis Pharm., Inc., No. 8:17-cv-01551-DOC-JDE, 2019 WL 4545960, at *11 (C.D. Cal. Mar. 27, 2019).  There, Allergan challenged, *inter alia*, Imprimis' alleged practice of preparing compounded product "in advance" of actually having received a particular prescription tied to a specific patient.  Id.  The court noted that "[t]he parties dispute whether the formulations at the 503A facilities are generated pursuant to valid prescriptions from a practicing doctor for an identified individual patient," but concluded that "this dispute is not genuine."  Imprimis, 2019 WL 4545960, at *11.  That is because Allergan adduced evidence that "Imprimis has not matched orders with specific patients and

---

[5]    Allergan requested a permanent injunction that would also "forbid a doctor from stating that a compounded medication is necessary by filling out an order form or a pre-printed verification; and enjoin Imprimis from directly or indirectly advising a doctor as to how it completes a form documenting medical necessity of compounded medications."  Imprimis, 2019 WL 3029114, at *11.  The court rejected Allergan's proposed injunction as "representative of its aggressive approach to this litigation" and "stretche[d] beyond the requirements of the law."  Id.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

customized prescriptions." Id.  For example, rather than disburse compounded product to a customer to fill a particular patient's needs, Imprimis appeared to "'pick 3 names' in order to ship[.]" Id.  Similarly, instead of fulfilling orders based on a valid *prescription*, "Imprimis has allowed customers to provide a surgery schedule or list of patients to obtain drug orders from the 503A facility." Id.

As evidence that they are complying with Section 503A's individual prescription requirement, defendants submit a declaration from TJ Bresnahan, AnazaoHealth's President.  See Dkt. 113-2 ("Bresnahan Decl.").  Bresnahan attests that Coast, the 503A facility at issue in this case, "dispenses its products pursuant to individualized prescriptions from treating physicians." Id. ¶ 6.  Indeed, the record before the Court appears to include instances where defendants have fulfilled written prescriptions—issued by licensed physicians and tied to particular patients—for defendants' compounded sodium thiosulfate. See, e.g., Dkt. 111-12, Exh. P (prescription written by physician tied to patient whose identity is redacted); Dkt. 111-12, Exh. Q (purchase order listing "Dr. [REDACTED]" as "Prescriber").  Moreover, Section 503A provides that a compounding facility may fulfill an order *prior to* receiving a valid prescription in certain circumstances.  See Imprimis, 2017 WL 10526121, at *2 (indicating that "Section 503A allows . . . drug compounding before the receipt of a prescription when the compounding is based on a history of receiving valid prescription orders for the compounding of the drug product, which orders have been generated solely within an established relationship between the compounding pharmacy and the patient or prescribing physician.").

Because of the disputed record presently before the Court, the Court cannot determine, at this juncture, whether Hope is likely to succeed on the merits of its claim that defendants have violated Section 503A's "individual prescription" requirement.

### 2.     Section 503B

Hope also argues that defendants' "outsourcing facilities" violate Section 503B because defendants' "drug is 'essentially a copy' of Hope's FDA-approved Sodium Thiosulfate Injection, and because [d]efendants are illegally selling their sodium thiosulfate drug through a wholesaler/distributor, AmerisourceBergen Corporation." Mot. at 1.  The Court addresses Hope's contentions in turn.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                           **'O'**

| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
|---|---|---|---|
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

### a.     "Essentially a Copy" Requirement

"Section 503B regulates drug products compounded by an 'outsourcing facility.'" <u>Athenex Pharma Sols., LLC v. Par Pharm., Inc.</u>, No. 1:18-cv-896, 2019 WL 4511914, at *1 (W.D.N.Y. July 9, 2019). "Under certain conditions, drugs compounded by a registered outsourcing facility are exempt from certain FDA drug approval requirements[.]" <u>Id.</u> "One condition is that the outsourcing facility may only compound products using bulk drug substances included on either (1) a list established by the FDA identifying bulk drug substances for which there is a clinical need"; or "(2) the FDA's drug shortage list."[6] <u>Id.</u> (citing 21 U.S.C. § 353b(a)(2) (internal alterations omitted). "Another condition is that the compounded drug cannot be 'essentially a copy' of a drug approved by the FDA." <u>Par</u>, 2019 WL 4511914, at *1 (citing 21 U.S.C. § 353b(a)(5)).

Section 503B defines "essentially a copy of an approved drug" as "a drug, a component of which is a bulk drug substance that is a component of an approved drug . . . unless there is a change that produces for an individual patient a clinical difference, as determined by the prescribing practitioner, between the compounded drug and the comparable drug." 21 U.S.C. § 353b(d)(2)(B). The FDA has issued an advisory document which "explain[s] how [the FDA] intend[s] to apply the definition of *essentially a copy of an approved drug* in section 503B(d)(2) when the compounded drug is compared to an approved drug[.]" Dkt. 106-1, Exh. E, Food and Drug Administration, <u>Compounded Drug Products That Are Essentially Copies of a Approved Drug Products Under Section 503B</u>

---

[6]     Although bulk sodium thiosulfate appears on neither the FDA's bulks list nor the FDA's drug shortage list, Hope does not contend that defendants' outsourcing facilities violate these requirements. That is because "[t]he FDA is currently developing the bulks list" but has, "[i]n the meantime, . . . issued an industry guidance document that describes interim regulatory policies[.]" <u>Par</u>, 2019 WL 4511914, at *2. The FDA's interim policy explains "that the FDA 'does not intend to take action against an outsourcing facility for compounding a drug using a bulk drug substance . . . if, among other conditions, the substance appears on a list of 'Category 1' substances that are currently under evaluation." <u>Id.</u> And, Hope acknowledges that "on October 30, 2019," the FDA "moved bulk sodium thiosulfate," the bulk ingredient in defendants' compounded products, onto the FDA's Category 1 list[.]" Reply at 6. Indeed, the FDA's moving of bulk sodium thiosulfate onto the FDA's Category 1 list prompted Hope to withdraw its previous preliminary injunction motion. <u>See</u> Dkt. 42 at 1–2.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
|----------|-------------------------|------|--------------|
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

of the Federal Food, Drug, and Cosmetic Act: Guidance for Industry (Jan. 2018) ("FDA Guidance on 503B 'Essentially a Copy' Requirement") at 6 (emphasis in original). The FDA's guidance indicates that "[i]f a component of the compounded drug is a bulk drug substance that is also a component of an approved drug, the compounded drug product is essentially a copy of an approved drug, and cannot be compounded under Section 503B, unless there is a prescriber determination of clinical difference[.]" Id. at 8.

The parties dispute whether defendants' compounded bulk sodium thiosulfate products are "essentially a copy" of Hope's FDA-approved product. Hope maintains that because defendants compounded sodium thiosulfate drug contains "sodium thiosulfate, the same 'bulk drug substance' that is in Hope's product," that "makes [d]efendant's drug essentially a copy of Hope's[.]" Mot. at 17. Defendants, on the other hand, aver that the omission of potassium in defendants' compounded products renders defendants' products clinically different from Hope's products, defeating Hope's claim that defendant's products are "essentially a copy." Opp. at 2. As the Court discussed above with respect to Hope's claim that defendants' compounding facilities violated Section 503A's "essentially a copy" requirement, the disputed record regarding the omission of potassium in defendants' compounded product precludes the Court from determining, at this juncture, whether defendants' compounded product are "essentially a copy" of Hope's product for the purposes of Section 503B.

The FDA's guidance indicates that "[i]f an outsourcing facility intends to rely on" a determination that there is a clinical difference "to establish that a compounded drug is not essentially a copy of an approved drug, the outsourcing facility should ensure that the determination is noted on the prescription or order (which may be a patient-specific prescription or a non-patient specific order) for the compounded drug." FDA Guidance on 503B "Essentially a Copy" Requirement at 8. The parties dispute whether defendants' outsourcing facilities fulfill orders only where an order provides the requisite "Clinical Difference" statement.

The FDA's guidance document acknowledges that the FDA "is aware that a health care practitioner who orders a compounded drug from an outsourcing facility for office stock will not know the identity of individual patients who will receive the compounded drug at the time of the order." FDA Guidance on 503B "Essentially a Copy" Requirement at 9. The FDA's document advises, however, that "[i]n that case, the outsourcing facility should obtain a statement from the practitioner that specifies the change between the compounded drug and the comparable approved drug and indicates that the compounded

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

drug will be administered or dispensed only to a patient for whom the change produces a clinical difference, as determined by the prescribing practitioner for that patient." FDA Guidance on 503B "Essentially a Copy" Requirement at 9. The FDA further indicates that "[s]uch assurances should be provided by the health care practitioner or a person able to make the representation for the health care practitioner." Id.

Hope argues that defendants fail to satisfy these requirements for several reasons. First, Hope points to defendants' standard order forms, which do not specify the change between defendants' compounded drug and Hope's approved drug—the removal of potassium—but instead generically require the customer to attest that "the use of the below indicated compound drug preparations that have one or more variations in: active ingredient(s), route of administration, dosage form, dosage strength, and excipient(s) from comparable manufactured drug products provides clinical and safety benefits for patients who require these formulations." See, e.g., Dkt. 121, Exh. C at 3. Hope also emphasizes that the seven order forms that defendants submit in support of their opposition brief are signed by the Director of Pharmacy, Clinical Manager, or Facility Administrator of defendants' customers, and that "[n]one of these people treat patients or have prescribing authority," nor the authority "to make this representation on behalf of the physicians who actually treat patients and prescribe drugs for patients." Reply at 14.

In response, defendants argue that Hope "cannot hold [d]efendants responsible for not using specific language or having a particular person's signature on the documents the medical providers use to order [d]efendants' [outsourcing facilities] products." Opp. at 3. Defendants further rely on language in the FDA's guidance document which indicates that "[a]t this time, [the FDA] generally does not intend to question the determinations of clinical difference that are documented in a prescription or order[.]" FDA Guidance on 503B "Essentially a Copy" Requirement at 11.

The Court does not find defendants' argument availing. Defendants appear to conflate the FDA's statement that it does not intend to question "the determination of clinical difference"—in other words, a healthcare provider's determination regarding whether a specified change in formula is required—with whether a healthcare provider has adequately documented that such a change is necessary. Indeed, the very next sentence in the FDA's guidance document indicates that "we do intend to consider *whether a* prescription or *order relied upon* by an outsourcing facility to establish that a drug is not essentially a copy *documents* that *the determination* was made." FDA Guidance on 503B "Essentially a Copy" Requirement at 11 (emphases added). Moreover, the FDA expressly

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

contemplated that some prescribers' documentation of their determinations, on the outsourcing facility's order forms, could be insufficient to satisfy Section 503B. See Id. at 10 ("An order that only identifies the product formulation, without more information, would not be sufficient . . ."). Presumably, that is why the FDA provides for a follow-up procedure that allows the outsourcing facility to "contact the prescriber or health care facility" to confirm whether there is a clinical need and "make a notation on the . . . order that the prescriber has determined that the compounded product contains a change that produces a clinical difference for patient(s)." Id. at 11.

The FDA sets forth the following examples of notations on a non-patient-specific order form that "would be sufficient" to satisfy Section 503B's "clinical difference" requirement:

- 'Liquid form, compounded drug will be prescribed to patients who can't swallow tablet' (if the comparable drug is a tablet)

- 'Dilution for infusion solution to be administered to patients who need this formulation during surgery' (if the comparable drug is not available at that concentration, pre-mixed with the particular diluent in an infusion bag)

- '1 mg, pediatric patients need lower dose' (if the comparable drug is only available in 25 mg doses).

FDA Guidance on 503B "Essentially a Copy" Requirement at 10. Unlike these examples, which specify the change as between the FDA-approved product and the desired compounded product, defendants' forms do not appear to specify that Hope's product contains potassium, while defendants' do not. Nor do defendants' forms appear to make clear that this change is "clinically" significant for patients suffering from calciphylaxis, to whom the presence of potassium would pose a health risk.

In accordance with the foregoing, Hope appears likely to succeed on the merits of its claim that defendants' outsourcing facilities violate Section 503B's "essentially a copy" requirement.

### b.    Prohibition on Wholesaling

Section 503B also contains a prohibition on wholesaling. The statute provides that a drug, compounded in an outsourcing facility, "will not be sold or transferred by an entity other than the outsourcing facility that compounded such drug." 21 U.S.C. § 353b(a)(8).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
|---|---|---|---|
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

The parties dispute whether defendants' outsourcing facilities are engaged in unlawful wholesaling.

Hope asserts that defendants "are illegally selling their sodium thiosulfate drug through a wholesaler/distributor, AmerisourceBergen Corporation." Mot. at 1. In support of this contention, Hope offers the declaration of its Dr. Craig Sherman, Hope's President, who attests that "[i]n September 2018, I received a phone call from a representative of a drug distributor, ASD Healthcare (which I know to be affiliated with the drug distributor AmerisourceBergen from visiting ASD's website . . . ), who inquired about purchasing Hope's Sodium Thiosulfate Injection." Sherman Decl. ¶ 15. Dr. Sherman further attests that "[t]he representative informed me that the distributor she represented distributed [d]efendants' compounded sodium thiosulfate drug product," but that defendants' "compounded drug product was abruptly unavailable." Id.

In addition, Hope submits webpages from AmerisourceBergen's Integrated Nephrology Network "INN" website. See Dkt. 105-2, Exh. T. The INN website, which display's AmerisourceBergen's name and logo, indicates that INN "is the largest specialty nephrology Group Purchasing Organization dedicated exclusively to dialysis providers and nephrology practices[.]" Id. at 289. A portion of INN's website, entitled "Manufacturer Partners," indicates that "[b]y creating collaborative and receptive opportunities for manufacturer-provider communication, [INN] allows manufacturers to present themselves as partners in renal care" and that manufacturers can "[r]ely on INN for solutions that deliver your product's key messages through channels that garner a response." Id. at 290. Under the "Pharmaceutical Manufacturer Partners" heading, the page displays "JCB Laboratories" and its logo. Id. A different page on INN's website, entitled "Service Contracts," indicates that "INN offers its members a wide variety of contracted services to help control costs, streamline business and enhance quality care. These service contracts are available to all INN members, and prove very valuable in positively affecting the bottom line of business." Dkt. 105-2, Exh. T at 292. Under a heading entitled "Compounding Pharmacy," the page lists "JCB Laboratories (now Fagron Sterile Services)." Id. And, an order form that an AnazaoHealth employee sent to a prospective customer—which lists "Sodium Thiosulfate 25% SDV PF (250mg/mL in 50mL vial)" as a product available for purchase—displays the logos for "Fagron Sterile Services," "JCB Laboratories," and "INN Amerisource Bergen Speciality Group." Dkt. 105-4, Exh. B.

In response to Hope's claim that defendants "sell their potassium-free products through" wholesalers, defendants aver that Hope has "provided nothing to substantiate this

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

claim other than second hand hearsay and images and information, none of which support [Hope's] factually incorrect claim."  Opp. at 13.  In support of their argument, defendants rely on the declaration of TJ Bresnahan, AnazaoHealth's President, who attests that "Coast does not distribute its products through wholesalers."  Bresnahan Decl. ¶ 6.  Similarly, defendants submit a declaration from Carl Woetzel, the President of Fagron and JCB, who attests that Fagron and JCB "do not distribute any products, including potassium-free sodium thiosulfate, through wholesalers" but instead "distribute products directly to end-user facilities." Dkt. 113-3 ("Woetzel Decl.") ¶ 7.  According to Woetzel, any "listing with General Purchasing Organization such as INN, and the inclusion of the INN logo on any consumer forms have no relationship whatsoever to how [Fagron] and JCB distribute products.  [Fagron] and JCB do not distribute their products through any wholesalers, including AmerisourceBergen Corporation."  Id. ¶ 8.

Section 503B provides that any drug compounded in an outsourcing facility "will not be *sold* or *transferred* by any entity other than the outsourcing facility that compounded such drug."  21 U.S.C. § 353b(a)(8) (emphases added).  Based on the record before the Court, the Court cannot determine whether Amerisource is engaged in the direct sale or transfer of defendants' compounded sodium thiosulfate product.[7]

### 3.    Private Enforcement of the FDCA

As discussed above, Hope's state-law consumer protection claims are predicated on defendants' alleged FDCA violations.  Even assuming Hope has raised a serious question regarding its claims that defendants have violated one or more of the FDCA's provisions, defendants argue that Hope "has no private right of action under the FDCA."[8]  Opp. at 11. In reply, Hope asserts that defendants' argument "is beside the point because Hope is not suing under the FDCA.  Hope is suing under state consumer-protection laws, which

---

[7]      During the hearing, defendants' counsel argued that AmerisourceBergen neither sells nor transfers defendants' compounded sodium thiosulfate product.    Instead, defendants' counsel indicated that members of AmerisourceBergen's INN purchasing network received discounts on defendants' product.

[8]      Defendants specifically raise this argument with respect to Hope's Tennessee, South Carolina, and Connecticut consumer protection claims.  Opp. at 14–15.  It is unclear whether defendants also challenge Hope's ability to vindicate defendants' alleged failure to comply with FDCA Sections 503A and 503B as violations of California and Florida law.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
|---|---|---|---|
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

incorporate state-law prohibitions on the sale of unapproved drugs." Reply at 17. According to Hope, then, its "claims rely on those state laws, not the FDCA." Id.

The FDCA provides that "all such proceedings for the enforcement, or to restrain violations, of this chapter shall be by and in the name of the United States." 21 U.S.C. § 337(a). "Courts have generally interpreted this provision to mean that no private right of action exists to redress alleged violations of the FDCA." Summit Tech., Inc. v. High-Line Med. Instruments Co., 922 F. Supp. 299, 305 (C.D. Cal. 1996). Accordingly, some courts have determined that "plaintiffs may not use other federal statutes or state unfair competition laws as a vehicle to bring a private cause of action that is based on violations of the FDCA." In re Epogen & Aranesp Off-Label Mktg. & Sales Practices Litig., 590 F. Supp. 2d 1282, 1290–91 (C.D. Cal. 2008); see also Goldsmith v. Allergan, Inc., No. 2:09-cv-07088-PSG-E, 2011 WL 147714, at *2 (C.D. Cal. Jan. 13, 2011) ("A purported state-law claim does not exist where the claim is in substance (even if not in form) a claim for violating the FDCA—that is, when the state claim would not exist if the FDCA did not exist") (internal citation omitted); accord Riley v. Cordis Corp., 625 F. Supp. 2d 769, 777 (D. Minn. 2009) ("a private litigant cannot bring a state-law claim against a defendant . . . when the state claim would not exist if the FDCA did not exist.").

The United States Court of Appeals for the Federal Circuit addressed the scope of the FDCA's preemption clause in Allergan, Inc. v. Athena Cosmetics, Inc., 738 F.3d 1350 (Fed. Cir. 2013). In that case, a pharmaceutical manufacturer, Allergan, sued a cosmetics company, Athena, based on Athena's marketing, distributing, and selling, without regulatory approval, products that qualify as drugs. Id. at 1352. Allergan sold an FDA-approved prescription drug used for the treatment of a condition that affects eyelash growth, and Athena sold, without FDA-approval, a product that contained the same active ingredient. Id. at 1353. Allergan asserted a UCL claim against Athena—premised on Athena's alleged violation of Cal. Health & Safety Code § 111550 ("the Sherman Law") as the predicate "unlawful" act—based on allegations that Athena "market[ed], s[old], and distribut[ed] its hair and/or eyelash growth products without a new drug application by the FDA or California State Department of Health Services." Id. (internal alterations omitted). Athena challenged the district court's denial of Athena's motion for judgment on the pleadings that the FDCA preempted Allergan's UCL claim. Allergan, 738 F.3d at 1353.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | **CIVIL MINUTES – GENERAL** | | **'O'** |
|---|---|---|---|
| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

On appeal, the Federal Circuit concluded "that the FDCA does not impliedly pre-empt [Allergan's] UCL claim."[9] Allergan, 738 F.3d at 1355. The Federal Circuit reasoned that the Sherman Law "incorporates various provisions of the FDCA, which does not itself allow a private right of action." Id. at 1354. The Federal Circuit explained that "'[t]he purpose of Congress is the ultimate touchstone in every pre-emption case.'" Id. at 1355 (citing Wyeth v. Levine, 555 U.S. 555, 565 (2009)). With this principle in mind, the Federal Circuit "d[id] not find a clear purpose by Congress to preempt" the Sherman Law, "the state law claim at issue." Allergan, 738 F.3d at 1355. The Federal Circuit determined that the Sherman Law "is not an obstacle to realizing federal objectives. To the contrary, it contains the provisions that parallel the FDCA, such that the statutes have consistent goals." Id. at 1356.

In Imprimis, another court in the Central District of California subsequently determined, based on the Federal Circuit's decision in Allergan, that "[t]he Sherman Law remains a valid mechanism for private enforcement of FDCA violations" through the UCL's unlawful prong. Imprimis, 2019 WL 4545960, at *8. After the court determined, at the summary judgment stage, "that as a matter of law there had been instances where Imprimis had" violated Sections 503A and 503B, the case proceeded to trial, and the court entered a post-trial permanent injunction. Imprimis, 2019 WL 4545960, at *1. The court noted that "Imprimis has not complied with the requirements set forth in Section 503A or Section 503B," and "[t]he Sherman Law forbids the sale of any drug that has not been approved by the California Department of Human Services or the FDA. It follows that failure to comply with the FDCA . . . affronts California's parallel prohibition." Id. at *6.

Consistent with Allergan and Imprimis, then, it appears that the FDCA does not preempt state-law, consumer protection claims based on alleged violations of the FDCA where there is a parallel state law that renders the same noncompliant conduct independently unlawful. See, e.g., Farm Raised Salmon Cases, 42 Cal. 4th 1077, 1091 n.13, 1094 (2008) (determining that "in California, an unlawful business practice, *including violations of the Sherman law*, may be redressed by a UCL private action" and reasoning "[t]hat the Sherman law imposes obligations identical to those imposed by the FDCA . . . does not substantively transform plaintiffs' action into one seeking to enforce federal law.") (emphasis in original). Because Hope's claims arise under California, Florida, South

---

9      The Federal Circuit had jurisdiction because Allergan previously asserted a claim for patent infringement.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
|----------|-------------------------|------|--------------|
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

Carolina, Connecticut, and Tennessee law, the Court looks to those states' laws to determine whether the FDCA preempts Hope's claims.

### a.     California

California's Sherman law provides that "'no person shall sell, deliver, or give away any new drug' that has not been approved by the California Department of Human Services or the FDA." Imprimis, 2019 WL 3029114, at \*6 (citing Cal. Health & Safety Code § 111550(a)–(b)). And, "[i]t follows that failure to comply with the FDCA . . . affronts" the Sherman Law. Imprimis, 2019 WL 3029114, at \*6. Here, Hope alleges that defendants are selling compounded products in violation of FDCA Sections 503A and 503B, that California's Sherman Law "prohibit[s] the sale of drugs not approved by the FDA," and that defendants "have violated the UCL by . . . marketing, selling, and distributing their products in violation of the California Sherman Law." FAC ¶ 15, 102. It does not appear, then, that the FDCA preempts Hope's UCL claim, which is predicated on Hope's allegations that defendants violated California's Sherman Law by failing to comply with the FDCA.

### b.     Florida

The Florida Drug and Cosmetic Act provides that "[a] person may not sell, offer for sale, hold for sale, manufacture, repackage, distribute, or give away any new drug unless an approved application has become effective under s. 505 of the federal act or unless otherwise permitted by the Secretary of the United States Department of Health and Human Services for shipment in interstate commerce." Fla. Stat. § 499.023. Accordingly, the Florida Drug and Cosmetic Act imposes on drug manufacturers independent statutory obligations that parallel those in the FDCA. See Fla. Stat. § 499.002(1)(b) (describing Florida Drug and Cosmetic Act "as intended to . . . [p]rovide uniform legislation to be administered so far as practicable in conformity with the provisions of . . . the Federal Food, Drug, and Cosmetic Act").

Here, Hope alleges that defendants' compounding practices violate Sections 503A and 503B, and thus the Florida Drug and Cosmetic Act, and Hope's FDUTPA claim is based on these underlying violations. See FAC ¶ 116. "FDUTPA requires that its provisions 'be construed liberally' to . . . 'protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.'" State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics &

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL                         'O'

| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
|---|---|---|---|
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

Neurosurgery, LLC, 278 F. Supp. 3d 1307, 1324 (S.D. Fla. 2017) (citing Fla. Stat. §
501.202(2)).  Accordingly, because Florida law appears to impose a separate, parallel
obligation on drug manufacturers to adhere to the FDCA, the Court cannot say, at this
juncture, that the FDCA bars Hope's FDUTPA claim.

### c.    Tennessee

The Tennessee Food, Drug and Cosmetic Act provides that "[n]o person shall sell,
deliver, offer for sale, hold for sale or give away any new drug unless an application with
respect to the drug has become effective under § 505 of the federal act."[10]  Tenn. Code §
53-1-110.  The TCPA makes "unlawful" the "[a]dvertising, promoting, selling or offering
for sale any good or service that is illegal or unlawful to sell in the state[.]"  Tenn. Code §
47-18-104 (b)(43)(C).

Defendants cite Autin v. Solvay Pharm., Inc., for the proposition that "courts have
held that plaintiffs may not use other laws to enforce violations of the FDCA indirectly."
Opp. at 15 (citing No. 05-2213-MA-AN, 2006 WL 889423, at *3 (W.D. Tenn. Mar. 31,
2006)).  In that case, however, plaintiffs directly challenged, as a TCPA violation, a drug
manufacturer's sale of a drug in contravention of applicable FDA regulations.  Autin, 2006
WL 889423, at *3.  By contrast, Hope avers that defendants' sales contravene the
Tennessee Food, Drug and Cosmetic Act because they violate FDCA Sections 503A and
503B, which Hope asserts gives rise to a TCPA claim.  See FAC ¶ 52.

Federal law impliedly preempts a state law only where "compliance with both
federal and state regulations is a physical impossibility . . . or when state law stands as an
obstacle to the accomplishment and execution of the full purposes and objectives of
Congress[.]"  Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153 (1982).
Because the Tennessee Food, Drug and Cosmetic Act simply creates an independent state

---

[10]    Although the Tennessee Food, Drug, and Cosmetic Act appears to vest the
Tennessee Department of Agriculture with primary enforcement authority, see Tenn. Code
Ann. § 53-1-101, Tennessee courts have concluded that private litigants may assert claims
predicated on underlying violations of the Tennessee Food, Drug, and Cosmetic Act.  See
Bissinger v. New Country Buffet, No. 2011-M-02183-COA-R9CV, 2014 WL 2568413, at
*19 (Tenn. Ct. App. June 6, 2014) (allowing decedent's estate to pursue negligence claim
against restaurant based on restaurant's alleged sale of oysters in violation of Tennessee
Food, Drug, and Cosmetic Act).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**　　　　　**'O'**

| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
|---|---|---|---|
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

law duty that mirrors the FDCA, the FDCA does not preclude Hope's TCPA claim based on defendants' alleged violation of the Tennessee Food, Drug, and Cosmetic Act.

### d.　Connecticut

The Connecticut Food, Drug, and Cosmetic Act provides that "[n]o person shall sell, deliver, offer for sale, hold for sale or give away any new drug unless . . . an application with respect thereto has been approved under Section 355 of the federal act[.]" Conn. Gen. Stat. § 21a-110(a).  CUTPA, Connecticut's consumer protection statute, states that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).  "In determining whether a practice violates CUTPA, courts have used the 'cigarette rule' adopted by the Federal Trade Commission, which looks to" factors including, *inter alia*, "[w]hether the practice . . . offends public policy as it has been established by statutes, the common law, or otherwise[.]" Bentley v. Greensky Trade Credit, LLC, 156 F. Supp. 3d 274, 288–89 (D. Conn. 2015) (internal citation omitted).

In arguing that the FDCA preempts Hope's CUTPA claim, defendants rely on Patane v. Nestle Waters N. Am., Inc.  See Opp. at 15 (citing 314 F. Supp. 3d 375 (D. Conn. 2018)). In that case, consumers asserted a CUTPA claim against a manufacturer, alleging that the manufacturer mislabeled its spring water in violation of the FDCA.  Patane, 314 F. Supp. 3d at 378.  The court dismissed the plaintiffs' CUTPA claim on preemption grounds, explaining that "[i]n order to survive preemption, a state law claim must rely on an independent state law duty that parallels or mirrors the FDCA's requirement[.]" Id. at 386. The plaintiffs' CUTPA claim failed to meet that standard, however, because the claim was "wholly FDCA-dependent." Id. at 387.

Defendants' reliance on Patane is unavailing because the court explicitly concluded that "a State can impose the *identical* requirement or requirements, and by doing so be enabled to enforce a violation of the FDCA as a violation of state law." 314 F. Supp. 3d at 386 (emphasis in original) (internal citation omitted).  That is Hope's theory here, as Hope alleges that the Connecticut Food, Drug, and Cosmetic Act imposes independent requirements that mirror those of the FDCA and that defendants violated these requirements in failing to adhere to Sections 503A and 503B, giving rise to a CUTPA claim.  See FAC ¶¶ 15, 131–32.  Accordingly, the Court rejects defendants' argument that the FDCA preempts Hope's CUTPA claim.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

### e.  South Carolina

The South Carolina Drug Act provides that "[n]o person shall introduce or deliver for introduction into intrastate commerce any new drug unless an application . . . is effective with respect to such drug, or an application with respect thereto has been approved and such approval has not been withdrawn under § 505 of the Federal act." S.C. Code § 39-23-70(a).  SCUTPA makes unlawful "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]"  S.C. Code § 39-5-20(a).  "In order to bring an action under [SCUTPA], the plaintiff must demonstrate," among other things, that the defendant engaged in an unlawful trade practice[.]"  Havird Oil Co. v. Marathon Oil Co., 149 F.3d 283, 291 (4th Cir. 1998).

Defendants cite Bean v. Upsher-Smith Pharm., Inc. for the proposition that "[t]he FDCA does not provide a private right of action for a defendant's violation of its provisions."  Opp. at 15 (citing No. 4:16-cv-01696-RBH, 2017 WL 4348330, at *6 (D.S.C. Sept. 29, 2017)).  In that case, the court determined that a plaintiff's state-law negligence claims "based on the alleged 'off-label' promotion of amiodarone [were] impliedly preempted . . . because the duties [p]laintiff alleges [d]efendants breached regarding 'off-label' promotions exist solely under the FDCA."  Id. at *7.  The court noted that "[p]laintiff has not directed the Court to any S.C. state law causes of action that parallel the federal safety requirements [.]"  Bean, 2017 WL 4348330, at *7.

Here, by contrast, Hope's SCUTPA claim is based on defendants' alleged violation of the South Carolina Drug Law, see FAC ¶¶ 9,126, which independently imposes on drug makers requirements that mirror those set forth in the FDCA.  The Court therefore finds unavailing defendants' preemption argument regarding Hope's SCUTPA claim.

### 4.  Other Miscellaneous Arguments

Assuming that Hope has demonstrated a likelihood of success on the merits of its claims that defendants violate state law by failing to adhere to FDCA Sections 503A and 503B and that the FDCA does not pre-empt Hope's state-law claims, defendants offer several additional arguments as to why Hope's claims nonetheless fail.  For example, defendants argue that Hope "has produced no evidence either in discovery or in its Motion that it lost sales because of [d]efendants allegedly illegal conduct."  Opp. at 13.  According to defendants, then, Hope "therefore has not made the requisite evidentiary showing of economic injury, and therefore has not established a likelihood of success on the merits."  Opp. at 13 (internal citations omitted).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                          **'O'**

| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
|----------|--------------------------|------|--------------|
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

As an initial matter, the cases upon which defendants rely are wholly inapt.  As an example, defendants rely on the Court's denial of a motion for a preliminary injunction in Essence Imaging Inc. v. Icing Images LLC, No. 2:13-cv-5449-CAS, 2014 WL 1384028, (C.D. Cal. Apr. 9, 2014).  In that case, the Court denied a printing product manufacturer's motion for a preliminary injunction, determining that the manufacturer failed to show a likelihood of success on the merits of its California False Advertising Law ("FAL") claim.  Id. at *2.  The Court noted that the manufacturer "contends in its memorandum in support of its motion for a preliminary injunction that it is 'losing sales to Defendants' falsely advertised claims,'" but concluded "that this contention is unsupported by any evidence" and was therefore insufficient to establish "statutory standing to bring an FAL claim."  Id. Hope does not assert a FAL claim—which contains unique statutory standing requirements—here.

And, contrary to defendants' assertion, Hope does submit evidence that it has lost sales to defendants because of defendants' alleged misconduct.[11]  The parties agree that Hope and defendants are the only two suppliers of sodium thiosulfate products.  Opp. at 20; Reply at 14.  Dr. Sherman, Hope's President, attests that: (1) defendants severely limited their sales of compounded sodium thiosulfate during a seven-month period between September 2018 and March 2019; (2) during this time, defendants' customers, including DaVita and Fresenius, began buying from Hope instead; (3) Hope's sales then increased by 44% in California, 146% in Connecticut, 67% in Florida, 134% in South Carolina, and 20% in Tennessee during this period; and (4) Hope's sales decreased once defendants resumed selling their compounded products, allegedly in violation of Sections 503A and 503B.  Sherman Decl. ¶¶ 14–21.  Accordingly, the Court concludes that Hope has set forth sufficient evidence of its own harm because "[w]hen two competitors split a market, such that one's lost sales are likely the other's gains, . . . 'it is reasonable to presume that every

---

[11]      Defendants cite Tseng v. Home Depot USA, Inc., for the proposition that "arguments of counsel and conclusory factual statements are improper in support of a motion for preliminary injunction."  Opp. at 13 (citing No. 05-cv-0908-RSM, 2006 WL 521723, at *3 (W.D. Wash. Mar. 2, 2006)).  In that case, the court determined that a declaration from the plaintiff's counsel regarding the infringement of the plaintiff's patent was "improper" because "it contains conclusory attorney argument that 'masquerades as expert opinion[.]'" Tseng, 2006 WL 521723, at *3.  While Hope submits a declaration from its counsel, dkt. 111-1, the declaration merely describes the exhibits that Hope offers in support of its motion, including defendants' sales data.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

dollar defendant makes has come directly out of plaintiff's pocket.'" K&N Eng'g, Inc. v. Spectre Performance, No. 5:09-cv-01900-VAP-DTB, 2012 WL 12893797, at *6 (C.D. Cal. Aug. 2, 2012) (citing TrafficSchool.com, Inc. v. Edriver Inc., 653 F.3d 820, 831 (9th Cir. 2011)) (internal alterations omitted).

Defendants further assert that Hope's claims fail because "[a]ll of the state statutes also require a showing of harm to . . . a consumer." Opp. at 13. According to defendants, Hope "cannot make that showing here . . . because [Hope] provided no evidence of any consumer injury, which is fatal to its claims." Id. Assuming *arguendo* that Hope's consumer protection claims require harm to consumers, rather than to simply Hope itself, Hope adduces evidence of such harm to consumers here. For example, Hope submits evidence that consumers are confused about the source of defendants' sodium thiosulfate drug, blaming Hope for defendants' allegedly deficient shipping practices and causing Hope to suffer a loss in Hope's reputation and goodwill. See Sherman Decl. ¶¶ 10–12; Dkt. 105-4, Exhs. C–D. Each of the consumer protection statutes that form the bases for Hope's claims appear to recognize consumer confusion as a form of consumer harm. See Xerox Corp. v. Apple Computer, Inc., 734 F. Supp. 1542, 1550 (N.D. Cal. 1990) (noting that competitor could state UCL claim where "there is a likelihood of consumer confusion as to source or sponsorship"); Wyndham Vacation Resorts, Inc. v. Timeshares Direct, Inc., 123 So. 3d 1149, 1152 (Fla. Dist. Ct. App. 2012) (determining that "conduct [that] could create consumer confusion and damage [competitor's] goodwill . . . is actionable under FDUTPA"); Suisman, Shapiro, Wool, Brennan, Gray, & Greenberg, P.C. v. Suisman, No. 3:04-cv-745-JCH, 2006 WL 387289, at *13 (D. Conn. Feb. 15, 2006) ("evidence of actual consumer confusion supports the inference that the plaintiff . . . has suffered an ascertainable loss entitling it to relief under CUTPA."); Sinclair & Assocs. of Greenville, LLC v. Crescom Bank, No. 2:16-cv-00465-DCN, 2016 WL 6804326, at *3 (D.S.C. Nov. 17, 2016) (noting that SCUTPA allows a plaintiff "to show that an unfair or deceptive act or practice adversely affects the public interest by demonstrating a potential for repetition" such as repeated "public confusion"); Kaldy v. Urshow.tv, Inc., No. 2:16-cv-00054, 2017 WL 104148, at *4 (E.D. Tenn. Jan. 10, 2017) (finding that "likelihood of confusion among consumers" can give rise to "claims under the TCPA.").

In addition, Hope argues that "because [d]efendants' [sic] cannot legally sell their drugs, consumers are necessarily injured by buying an illegal product." Reply at 16. That is because, according to Hope, "there is no market value for an unlawful product." Reply at 16. The consumer protection statutes upon which Hope's claims are based each recognize that, in particular circumstances, the sale of an illegal product can itself give rise

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

to a claim. See Gitson v. Trader Joe's Co., No. 13-cv-01333-WHO, 2013 WL 5513711, at *10 (N.D. Cal. Oct. 4, 2013) (finding that plaintiffs could state a UCL claim predicated on violation of the Sherman Law based on defendant's alleged failure to comply with FDA's regulations); Morris v. Viking Pools Ne., Inc., 492 F. Supp. 2d 90, 94 (D. Conn. 2007) (determining that plaintiff could state CUTPA claim against pool installer where installer unlawfully installed pool without a license and recognizing that unlawful installation would cause redressable "financial injury" in form of higher price); In re StarLink Corn Prod. Liab. Litig., 212 F. Supp. 2d 828, 835, 852 (N.D. Ill. 2002) (determining that manufacturers' sale of genetically modified corn that failed to comply with Environmental Protection Agency's requirements gave rise to TCPA claim); Debernardis v. IQ Formulations, LLC, 942 F.3d 1076, 1085 (11th Cir. 2019) (determining that plaintiffs could state FDUTPA claim based on purchase of dietary supplements unlawfully adulterated in violation of the FDCA because "a dietary supplement that is deemed adulterated and cannot lawfully be sold has no value."); Jones v. Ram Med., Inc., 807 F. Supp. 2d 501, 510 (D.S.C. 2011) (determining that pharmaceutical device manufacturers' sale of surgical mesh gave rise to SCUTPA claim based on allegations that manufacturers' product was a counterfeit that violated FDA regulations and reasoning that plaintiffs "have alleged that [d]efendants have acted in a manner which is clearly not permitted under FDA regulations.").

### C.     Irreparable Harm

Having determined that Hope has at least raised "serious questions" regarding the merits of its claims, the Court next determines where Hope has demonstrated that it would suffer irreparable harm in the absence of a preliminary injunction. On this point, Hope bears the burden of demonstrating "that irreparable injury is *likely* in the absence of an injunction." Winter, 555 U.S. at 22 (emphasis in original). "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." Arizona Dream Act Coal. v. Brewer, 757 F.3d 1053, 1068 (9th Cir. 2014). Stated differently, "economic harm is not generally considered irreparable." E. Bay Sanctuary Covenant v. Trump, 950 F.3d 1242, 1280 (9th Cir. 2020). As such, "a party is not entitled to a preliminary injunction unless he or she can demonstrate more than simply damages of a pecuniary nature." Regents of Univ. of California v. Am. Broad. Companies, Inc., 747 F.2d 511, 519 (9th Cir. 1984).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

### 1.     Loss of Customers, Market Share, and Goodwill

Here, Hope avers that without a preliminary injunction, it will suffer several forms of irreparable harm.  For example, Hope argues that its lost sales are not compensable by money damages because its consumer protection claims do not allow for recovery of money damages, and "[l]ost profits that are *not* compensable through monetary damages are irreparable harm."  Reply at 21 (emphasis in original).

Hope also argues that absent an injunction, it will "los[e] customers, market share, reputation, and goodwill due to [d]efendants' conduct."  Mot. at 22.  Courts have recognized that, in some circumstances, the likelihood of loss of customers, market share, and goodwill can support the issuance of a preliminary injunction.  See, e.g., Herb Reed Enterprises, LLC v. Fla. Entm't Mgmt., Inc., 736 F.3d 1239, 1250 (9th Cir. 2013) ("Evidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm."); Bird-B-Gone, Inc. v. Bird Barrier Am., Inc., No. 8:12-cv-00178-AG-RNB, 2013 WL 11730662, at *2 (C.D. Cal. Mar. 20, 2013) ("Lost market share can constitute irreparable harm[.]"); see also Car-Freshner Corp. v. Valio, LLC, No. 2:14-cv-01471-RFB-GWF, 2016 WL 7246073, at *8 (D. Nev. Dec. 15, 2016) ("Damage to reputation and loss of customers are intangible harms not adequately compensable through monetary damages.").  However, any finding of irreparable harm "cannot be grounded in platitudes rather than evidence."  Cutera, Inc. v. Lutronic Aesthetics, Inc., No. 2:20-cv-00235-KJM-DB, 2020 WL 1234551, at *6 (E.D. Cal. Mar. 13, 2020) (citing Herb, 2-2- W; 1234551, at *6).

Hope submits evidence that on two separate occasions, it received inquiries for sodium thiosulfate products that were apparently intended for defendants.  See Sherman Decl. ¶¶ 11–12.  On one of these occasions, one of defendants' customers appeared to blame Hope for defendants' tardy shipment of defendants' products.  See Dkt. 105-4, Exh. D.  Hope further urges that "confused customers may associate the many FDA warning letters [d]efendants have received with Hope, misleading customers into thinking that Hope's drugs, like [d]efendants', are unsafe."  Mot. at 22 (internal citations omitted).  And, after defendants resumed selling their compounded sodium thiosulfate products, Hope lost two customers, DaVita and Fresenius, to defendants.  Sherman Decl. ¶¶ 14–21.

That two of defendants' customers previously confused Hope with defendants, and that Hope lost to defendants two specific customers, DaVita and Fresenius, who were originally defendants' customers, does not, itself, appear to demonstrate the type of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | | 'O' |
|---|---|---|---|---|
| Case No. | 2:19-cv-07748-CAS(PLAx) | | Date | July 7, 2020 |
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | | |

irreparable harm that would warrant a preliminary injunction. See Open Text, S.A. v. Box, Inc., 36 F. Supp. 3d 885, 906 (N.D. Cal. 2014) ("Although the 'quantum of evidence' required to prove irreparable harm is unclear, case law is clear that the *potential* for loss of market share is insufficient. Open Text has not provided to the Court, with any level of specificity, what sales have been lost to Box, what Open Text's market share is in relevant market, or any evidence of actual lost customers going to Box.") (emphasis in original). Hope does not, for example, point to specific customers that it fears it may lose to defendants should defendants continue to sell their compounded products. Cf. Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., 240 F.3d 832, 841 (9th Cir. 2001) (determining that safe manufacturer had shown irreparable harm warranting preliminary injunction enjoining manufacturer's competitor from using the United States Customs Service to seize manufacturer's safes where safes were "earmarked" for particular customers such that, without injunction, seizure would cause manufacturer "to lose its newfound customers and accompanying goodwill and revenue."). On the other hand, Hope and defendants are the only two suppliers of sodium thiosulfate products in the United States, and "[t]he existence of a two-player market may well serve as a substantial ground for granting an injunction because it creates an inference that an infringing sale amounts to a lost sale" with respect to the other market participant. Open Text, 36 F. Supp. at 906.

On balance, Hope has demonstrated a likelihood of irreparable harm based on loss of customers, market share, and goodwill, especially since Hope and defendants are the only two participants in the market for sodium thiosulfate in the United States. The unavailability of monetary damages, with respect to at least several of Hope's claims, further bolsters the Court's finding of irreparable harm.[12]

    **2.    Delay**

In addition, "[d]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction[.]" Open Text, 36 F. Supp. 3d at 909. The Ninth Circuit has stated that a "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." Oakland Tribune, Inc. v. Chronicle Pub. Co., 762 F.2d 1374, 1377

---

[12]  For example, the California Supreme Court has explained that "[w]hile the scope of conduct covered by the UCL is broad, its remedies are limited." Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1144 (2003). Accordingly, "damages cannot be recovered." Id. Similarly, with respect to Hope's FDUTPA claim, defendants themselves argue that "lost profits are not recoverable under the Act." Opp. at 15.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL                            'O'

| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

(9th Cir. 1985). Defendants argue that even assuming Hope has demonstrated defendants' conduct has harmed Hope, Hope's delay in filing the present motion for a preliminary undermines that harm.

Here, Carl Woetzel, the President of Fagron and JCB, attests that "JCB has been producing and distributing potassium-free sodium thiosulfate since 2011." Woetzel Decl. ¶ 5. By contrast, Hope only received approval from the FDA to sell its sodium thiosulfate injection, as a treatment for acute cyanide poisoning, in 2012. See Mot. at 6. Hope sent defendants a cease and desist letter on August 17, 2018, notifying defendants that Hope "manufactures the only FDA-approved sodium thiosulfate drug approved in the United States" and indicating that JCB "distributes compounded sodium thiosulfate in violation of" Section 503B of the FDCA. See Dkt. 27-1, Exh. B. JCB responded on September 7, 2018, indicating that "JCB will not cease compounding and dispensing Sodium Thiosulfate" because, inter alia, JCB "believes that it is in compliance with [the] FDA's expectations under the FDCA[.]" Dkt. 113-1, Exh. B. More than one year after sending its cease and desist letter, Hope filed this action on September 6, 2019. Dkt. 1. While Hope originally moved for a preliminary injunction on September 27, 2019, it withdrew that motion, filing the present preliminary injunction motion on June 1, 2020. Dkts. 22, 46, 105. That Hope knew of defendants' alleged unlawful conduct in August of 2018 but did not file the present motion until June of 2020 tends to undermine Hope's claim that defendants' conduct will irreparably harm Hope unless the Court grants Hope's request for injunctive relief.

In reply, Hope claims it did not unreasonably delay in filing the present motion for injunctive relief. Hope points out that "[d]efendants stopped selling their compounded sodium thiosulfate drugs shortly after Hope sent its letter," such that during the time when defendants were no longer selling their compounded product, "Hope had no reason to seek . . . an injunction against conduct that was not occurring." Reply at 18. After defendants resumed "their illegal drug sales in April 2019," and after another court in Imprimis entered a permanent injunction in July of 2019, which "clarif[ied] the law of sections 503A and 503B," Hope asserts that it "then promptly filed this lawsuit in September 2019." Id. Hope explains that it withdrew its prior preliminary injunction motion because that motion challenged defendants' practice of compounding bulk sodium thiosulfate even though bulk sodium thiosulfate did not then appear on the FDA's "bulks list," but after Hope filed the motion, the FDA subsequently added bulk sodium thiosulfate to its Category 1 list, mooting Hope's motion. Reply at 19. Hope attributes its further delay in filing the present motion to defendants' alleged refusal to produce certain discovery that would form the basis for

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

the present motion, requiring Hope to bring a motion to compel discovery responses. Id. Pursuant to an order granting in part Hope's motion to compel, defendants "produced 150,000 pages of documents" to Hope on March 25, 2020. Id.; see also Dkt. 76 (order granting in part Hope's motion to compel defendants' discovery responses).

While "a party requesting a preliminary injunction must generally show reasonable diligence," Benisek v. Lamone, 138 S. Ct. 1942, 1944-45 (2018), "delay is only one factor among the many that we consider in evaluating whether a plaintiff is likely to suffer irreparable harm absent interim relief," and "by itself is not a determinative factor in whether the grant of interim relief is just and proper." Cuviello v. City of Vallejo, 944 F.3d 816, 833 (9th Cir. 2019) (citations omitted). In accordance with the foregoing, the Court concludes that Hope did not unreasonably delay in filing the present motion for a preliminary injunction.

### D.     Balance of Hardships

"In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Amoco Prod. Co. v. Vill. of Gambell, AK, 480 U.S. 531, 542 (1987). Here, Hope argues that "[t]he balance of hardships weighs strongly in Hope's favor." Mot. at 23. Dr. Sherman, Hope's President, attests that Hope's "Sodium Thiosulfate Injection is one of three products sold by Hope[.]" Sherman Decl. ¶ 21. According to Hope, then, allowing defendants to continue to sell their compounded products would cause Hope substantial hardship in the form of lost sales and goodwill with respect to one of Hope's only three products. Mot. at 23–24. Hope further asserts that "[t]he extent to which [d]efendants' business depends on the sale of illegal sodium thiosulfate drugs is not precisely known, but [is] likely quite small when compared to their total revenues." Id. at 23–24 n. 9.

Defendants, in turn, argue that "the balance of hardships strongly favors" them. Opp. at 19. Defendants urge that they "have been in the business of compounding and selling their potassium-free sodium thiosulfate for years" and that "[g]ranting the injunction would require [d]efendants to shut down a significant portion of [their] business [that] has taken years to develop and grow[.]" Opp. at 19. Defendants also assert that they primarily sell their compounded sodium thiosulfate products for the off-label use of treating renal patients suffering from calciphylaxis, so it is unlikely that allowing them to continue selling their compounded products will cause substantial harm to Hope since Hope is "still . . . unable to market its sodium thiosulfate to treat calciphylaxis without FDA approval[.]" Id.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| CIVIL MINUTES – GENERAL | | | 'O' |
|---|---|---|---|
| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

Neither party has provided any evidence from which the Court can determine the extent to which the parties' businesses depend on the sale of the parties' respective sodium thiosulfate products. However, a limited injunction that would allow defendants to continue operating so long as defendants comply with the "essentially a copy" requirements of Sections 503A and 503B would not unduly burden defendants' business. By contrast, without an injunction, Hope faces additional lost sales and goodwill. For these reasons, the Court concludes that the balance of hardships favors Hope.

**E.     Public Interest**

Finally, the Court considers "whether the public interest will be advanced by granting preliminary relief." Preminger v. Principi, 422 F.3d 815, 823 (9th Cir. 2005). The parties dispute whether a preliminary injunction would advance the public interest.

Defendants urge that "granting the injunction would deprive a population of dialysis patients of access to treatment for calciphylaxis." Opp. at 19. Indeed, defendants provide a May 30, 2018 letter from one of defendants' customers, Dr. Jeffrey Hymes, the Chief Medical Officer of Fresenius Kidney Care, "urg[ing] the FDA to continue to allow compounding of sodium thiosulfate by JCB/Fagron" because of the clinical value defendants' products, rather than Hope's, provide renal patients suffering from calciphylaxis. Dkt. 113-1, Exh. A. In an October 7, 2019 letter, Dr. Hymes opposes Hope's efforts to enjoin defendants, indicating that he "ha[s] grave concerns about this action." Id. Dr. Hymes explains that, "[a]t any given time 400-500 patients may be" receiving treatment from Fresenius using defendants' compounded sodium thiosulfate product, and "[t]he arbitrary elimination of one of the two major suppliers of this compound places our patients at the risk of product unavailability." Id. Dr. Hymes further contends that, "[a]dditionally, a monopoly on thiosulfate by one company creates potential financial jeopardy for [Fresenius], which treats approximately 200,000 patients, 80% of whom are Medicare beneficiaries." Id. Similarly, defendants submit a letter from another of defendants' customers, Dr. George Aronoff, the Vice President of Clinical Affairs for DaVita Kidney Care, to the FDA "strongly urg[ing] the FDA to continue to allow compounding . . . by JCB/Fagron" and nothing that defendants' products can be used to treat DaVita's patients that suffer from [c]alciphylaxis." Dkt. 113-1, Exh. B. Dr. Aronoff indicates that "[c]alciphylaxis occurs in about 4% of dialysis patients . . . for DaVita this equates to approximately 6,000 patients." Id.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
|---|---|---|---|
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

Hope asserts that "[t]he public interest favors an injunction for the simple reason that [d]efendants are seeking to gain a competitive advantage by violating the law." Reply at 21. Thus, "[g]ranting an injunction would not only protect Hope from unlawful competition but would also put an end to illegal activity, both of which are in the public interest." Mot. at 24. Hope moreover argues that an injunction "would also ensure the safety and effectiveness of the sodium thiosulfate drug on the market." Id. at 25. Hope submits warning letters, inspection reports, and recall notices that the FDA appears to have issued to defendants.[13] See Dkt. 106-1, Exhs. I–K, M–U. One release by the FDA, dated August 26, 2013, indicates that JCB voluntarily recalled products, including sodium thiosulfate, "due to concerns of sterility assurance following a recent inspection[.]" Dkt. 106-1, Exh. K. In a September 14, 2018 inspection report, the FDA noted that "[y]our firm lacked valid analytical and stability data to support the . . . expiration date assigned to all of your products such as Vancomycin, Sodium Thiosulfate, and Ephedrine Sulfate." Dkt. 106-1, Exh. J at 157. The FDA's inspection report further noted that JCB's compounded sodium thiosulfate has "no method validation for potency, sterility, and endotoxin." Id. at 158. And, in a December 18, 2018 email chain, JCB and Fagron employees discussed having [REDACTED].

[T]here is a public interest in upholding the law and having parties abide by their legal duties." Judge Virginia A. Phillips & Judge Karen L. Stevenson, Federal Civil Procedure Before Trial, § 13:76.1 (The Rutter Group 2019). And, in Imprimis, another court in the Central District of California issued a post-trial permanent injunction, determining that the public interest favored enjoining a drug compounder that had violated Sections 503A and 503B. 2019 WL 3029114, at *13. The court explained that "some compounders have taken advantage of the Section 503A exception in order to distribute drugs without individualized prescriptions, or have compounded drugs in 503B facilities using ingredients that are not undergoing FDA evaluation." Imprimis, 2019 WL 3029114, at *13. The court reasoned that "the State of California has chosen to pass a law that parallels federal approval of such new drugs; and . . . this provides a limited mechanism for protecting against their distribution and production in California." Id. Accordingly, the Court concluded that "[t]he public interest is not disserved by enforcing these

---

[13]     Defendants characterize these materials as "hearsay," "old press releases," "old FDA inspection reports," and "recalls of products other than [d]efendants' potassium-free sodium thiosulfate[.]" Opp. at 5, 14.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**            **'O'**

| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
|---|---|---|---|
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

guidelines in California to protect patients from the sale and distribution of drugs that are not produced in accordance with applicable requirements." Id.

California, Florida, Connecticut, South Carolina, and Tennessee each provide for limited mechanisms to protect against the distribution and production of drugs that do not conform with their various statutory requirements, which parallel those set forth in the FDCA. On balance, the Court therefore concludes that the public interest factor favors the entry of a preliminary injunction.

**F.    Appropriate Bond**

Rule 65(c) provides that the Court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "Rule 65(c) invests the district court with discretion as to the amount of security required, *if any*." Jorgensen v. Cassiday, 320 F.3d 906, 919 (9th Cir. 2003) (emphasis in original) (internal citation omitted). "In particular, the district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." Johnson, 572 F.3d at 1086 (internal citation and alteration omitted).

During the hearing, defendants' counsel indicated defendants' position that no bond would be necessary to the extent that any preliminary injunction entered by the Court allowed defendants to continue operating so long as defendants' 503A and 503B facilities required more specific attestations from customers regarding the clinical need for defendants' products. Accordingly, the Court concludes that Hope need not post a bond.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' | |
|---|---|---|---|---|
| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 | |
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | | |

## V. CONCLUSION

For the foregoing reasons, the Court orders as follows:

1.      To the extent that the parties' respective requests for judicial notice seek judicial notice of the existence of particular documents, dkts. 106, 114, 123, the Court **GRANTS** the parties' requests for judicial notice.  The Court **DENIES** the parties' requests for judicial notice in all other respects.

2.      The Court **OVERRULES** the parties' evidentiary objections.

3.      The Court **GRANTS in part** Hope's motion for a preliminary injunction as follows[14]:

   a.      Defendants and their officers, agents, servants, employees, attorneys and all those acting in concert with them, shall be preliminarily enjoined from directly or indirectly dispensing or distributing any compounded sodium thiosulfate product from a 503A facility into California, Connecticut, Florida, South Carolina, or Tennessee unless: (i) defendants are provided a valid prescription or order form for the product; (ii) the prescription or order form includes an attestation specifically indicating that defendants' compounded product, which does not contain potassium, will produce a significant difference for the intended patient; (iii) the attestation specifies that defendants' compounded product, rather than the comparable commercially available drug product, is "medically necessary" for the intended patient; and (iv) the attestation indicates that the attestation is made or approved by the intended patient's prescribing practitioner.

   b.      Defendants and their officers, agents, servants, employees, attorneys and all those acting in concert with them, shall be preliminarily enjoined from directly or indirectly dispensing or distributing any compounded sodium thiosulfate product from a 503B facility into California, Connecticut, Florida, South Carolina, or Tennessee unless:

---

[14]      To the extent necessary, each of the foregoing findings of fact may deemed a conclusion of law, and each of the foregoing conclusions of law may be deemed a finding of fact.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:19-cv-07748-CAS(PLAx) | Date | July 7, 2020 |
|---|---|---|---|
| Title | HOPE MEDICAL ENTERPRISES, INC. v. FAGRON COMPOUNDING SERVICES, LLC ET AL. | | |

(i) defendants are provided an order form for the product; (ii) the order form includes an attestation specifically indicating that defendants' compounded product, which does not contain potassium, will produce a clinical difference; (iii) the attestation specifies that defendants' compounded product, rather than the comparable commercially available drug product, is "medically necessary" for the patients to whom defendants' drug will be distributed or dispensed; and (iv) the attestation indicates that the attestation is made or approved by a prescribing practitioner.

c.      The Court **DENIES** Hope's motion for a preliminary injunction in all other respects.

IT IS SO ORDERED.

|  | 00 | : | 00 |
|---|---|---|---|
| Initials of Preparer | | CMJ | |