O

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HOPE MEDICAL ENTERPRISES INC.,

              Plaintiff,

            – v. –

FAGRON COMPOUNDING SERVICES, LLC ET AL.,

          Defendant.

No. 2:19-cv-07748-CAS(PLAx)

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## I.    INTRODUCTION

      This case was tried to the Court on August 24, 2021, August 25, 2021, August 26, 2021, August 27, 2021, and September 2, 2021.  Attorneys Joseph Akrotirianakis and Aaron Craig of King & Spalding LLP appeared on behalf of plaintiff Hope Medical Enterprises, Inc. ("Hope").  Attorneys Ellen Robbins and Lawrence Silverman of Akerman LLP and Sherylle Francis of Sherylle Francis PA appeared on behalf of defendants Fagron Compounding Services, LLC ("Fagron"), JCB Laboratories, LLC ("JCB"), AnazaoHealth Corporation ("Anazao"), and Coast Quality Pharmacy, LLC ("Coast") (collectively, "defendants").  Based on the evidence and testimony presented at trial, the Court makes the following findings of fact and conclusions of law.  To the

extent any finding of fact is better characterized as a conclusion of law, or vice versa, it shall be so characterized.

## II.    FINDINGS OF FACT

### A.    Background

1.    Hope filed this action against defendants Fagron, JCB, Anazao, and Coast on September 6, 2019.  Dkt. 1.  Fagron and JCB are hereinafter sometimes referred to as "the 503B defendants."  Defendants are all owned either directly or indirectly by Fagron BV, a company registered in Belgium, or its affiliate, Fagron NV, a company registered and headquartered in the Netherlands.  Dkt. 47 ¶ 13.  The gravamen of Hope's claims is that defendants' drug compounding practices constitute unfair competition in violation of several states' unfair trade practice and consumer protection laws.

2.    Hope and defendants sell competing drugs containing sodium thiosulfate as an active pharmaceutical ingredient ("API").  Sodium thiosulfate is hereinafter sometimes referred to as "STS".  Defendants have been producing and selling their drug since 2011.  Exhs. 540, 540A.  Hope began selling its sodium thiosulfate drug in 2012, after the drug received FDA approval as a treatment for acute cyanide poisoning.  Trial Testimony of Dr. Sherman.  Defendants have not received FDA approval for their sodium thiosulfate drugs.  Defendants' sodium thiosulfate drugs differ from Hope's sodium thiosulfate drugs, because unlike Hope's drugs, defendants' drugs are compounded and do not contain potassium.  See Dkt. 387 ("Final Pretrial Conf. Order") at 2:17-18.  Defendants have produced their sodium thiosulfate drugs by two means: through compounding at pharmacies, referred to as 503A facilities, and through compounding at outsourcing facilities, referred to as 503B facilities, as described in greater detail below.

3.    On November 12, 2019, Hope filed its operative amended complaint.  Dkt. No. 47 ("FAC").  Hope asserted five claims, under (1) California's Unfair Competition Law ("UCL"), (2) Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), (3) Tennessee's Consumer Protection Act ("TCPA"), (4) South Carolina's Unfair Trade

Practices Act ("SCUTPA"), and (5) Connecticut's Unfair Trade Practices Act ("CUTPA"). Id. at ¶¶ 97–137. California, Florida, Tennessee, South Carolina, and Connecticut are hereinafter sometimes referred to as the "five states".

4.     On June 1, 2020, Hope filed a motion for a preliminary injunction. Dkt. 105. Hope's motion was based in part on defendants' alleged production and sale of their sodium thiosulfate drugs without prescriber determinations required to exempt the drugs from premarket drug approval laws. Id. Defendants opposed the motion by arguing, among other grounds, that the Federal Food, Drug and Cosmetic Act ("FDCA") preempts Hope's claims. Dkt. 113. The FDCA requires compounded drugs to be approved by the FDA before they can be sold with two limited statutory exceptions: Section 503A, which permits the sale of drugs compounded at pharmacies subject to specific limitations, and Section 503B, which permits the sale of drugs compounded at outsourcing facilities subject to specific limitations, as described in greater detail below.

5.     This Court granted Hope's motion in part on July 7, 2020. Dkt. 141 ("Prelim. Inj."). The Court ordered as follows:

a.     Defendants and their officers, agents, servants, employees, attorneys and all those acting in concert with them, shall be preliminarily enjoined from directly or indirectly dispensing or distributing any compounded sodium thiosulfate product from a 503A facility into California, Connecticut, Florida, South Carolina, or Tennessee unless: (i) defendants are provided a valid prescription or order form for the product; (ii) the prescription or order form includes an attestation specifically indicating that defendants' compounded product, which does not contain potassium, will produce a significant difference for the intended patient; (iii) the attestation specifies that defendants' compounded product, rather than the comparable commercially available drug product, is "medically necessary" for the intended patient; and (iv) the attestation indicates that the attestation is made or approved by the intended patient's prescribing practitioner.

2

     b.     Defendants and their officers, agents, servants, employees, attorneys and all those acting in concert with them, shall be preliminarily enjoined from directly or indirectly dispensing or distributing any compounded sodium thiosulfate product from a 503B facility into California, Connecticut, Florida, South Carolina, or Tennessee unless: (i) defendants are provided an order form for the product; (ii) the order form includes an attestation specifically indicating that defendants' compounded product, which does not contain potassium, will produce a clinical difference; (iii) the attestation specifies that defendants' compounded product, rather than the comparable commercially available drug product, is "medically necessary" for the patients to whom defendants' drug will be distributed or dispensed; and (iv) the attestation indicates that the attestation is made or approved by a prescribing practitioner.

Prelim. Inj. at 38–39.

6.     On November 2, 2020, Hope moved for summary judgment.  Dkt. 151.  On the same day, Hope also moved for an order holding defendants in contempt for violating the preliminary injunction.  Dkt. 153.  Defendants opposed Hope's motion for contempt and asked the Court to reconsider the preliminary injunction, again arguing that the FDCA preempts Hope's claims.  Dkt. 173 at 14–17.  Defendants also moved for summary judgment.  Dkt. 178.

7.     On January 25, 2021, this Court denied both parties' summary judgment motions.  Dkt. 226 at 43.  The Court reserved judgment on Hope's motion for contempt.  Id. at 41.  The Court denied defendants' motion for reconsideration of the preliminary injunction under Local Rule 7–18.  Id. at 43.

8.     Defendants filed a notice of appeal from the order denying their motion for reconsideration of the preliminary injunction.  Dkt. 238.  This appeal remains pending in the Ninth Circuit.  Id.  Defendants also moved the Court to certify for interlocutory appeal the order denying their motion for reconsideration.  Dkt. 227.  On March 15, 2021, this Court denied that motion.  Dkt. 255.

3

9.     On April 21, 2020, Hope served defendants with a declaration by Craig Sherman, Hope's co-founder and President, which stated that Hope waived all claims for damages.  Dkt. 341-3.  On June 28, 2021,  Hope moved to strike defendants' jury demand.  Dkt. 341.  On July 12, 2021, this Court granted Hope's motion to strike the jury demand, finding that as a result of Hope's waiver of all claims for damages, neither the claims alleged nor the defenses raised give rise to a Seventh Amendment right to a jury trial.  Dkt. 353.

10.     On August 12, 2021, the parties submitted their Amended Proposed Final Pretrial Conference Order which included various stipulated facts to which all parties agreed.  Final Pretrial Conf. Order at 2:5–5:1.  This Court adopts all such stipulated facts as findings of facts whether or not restated herein.

11.     On August 24, 2021, this matter came before the Court for a five-day bench trial.  The parties called as witnesses Kalah Auchincloss, Jason McGuire, Suzanne Heinemann, and Dennis David.  Dkt. 413.  Additionally, the Court received into evidence deposition testimony of Dr. George Aronoff, Dr. Jeffrey Hymes, Timothy Bresnahan, Tamekka Grant, Chris Kirkes, Keiola Peterson, Phu Pham, Shawn Trull, and Carl Woetzel.  Dkts. 302, 322.  The witnesses who were called at trial, the depositions of the foregoing witnesses, and the exhibits that were offered, admitted into evidence, and considered by the Court are identified in the witness and exhibit lists filed on September 2, 2021.  Dkt. 413.

## B.     Regulatory Framework Governing Drug Compounding

12.     At issue in this case are defendants' sales of their compounded sodium thiosulfate drugs.  "Drug compounding is a process by which a pharmacist or doctor combines, mixes, or alters ingredients to create a medication tailored to the needs of an individual patient."  Thompson v. W. States Med. Ctr., 535 U.S. 357, 360–61 (2002).  "Compounding is typically used to prepare medications that are not commercially available, such as medication for a patient who is allergic to an ingredient in a mass-produced product."  Id.

4

13.     In 1938, Congress enacted the FDCA "to regulate drug manufacturing, marketing, and distribution."  Med. Ctr.  Pharmacy v. Mukasey, 536 F.3d 383, 388 (5th Cir. 2008).  The FDCA provides that "[n]o person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application . . . is effective with respect to such drug."  21 U.S.C. § 355(a).

14.     The FDCA defines "new drug" as "[a]ny new drug . . . the composition of which is such that such drug is not generally recognized . . . as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof[.]" 21 U.S.C. § 321 (p)(1).  "The FDCA invests the Food and Drug Administration (FDA) with the power to enforce its requirements."  Thompson, 535 U.S. at 362.  To be deemed 'safe and effective' and thereby obtain FDA approval, a new drug must undergo an extensive application and approval process."  Med. Ctr. Pharmacy, 536 F.3d at 388.  The FDCA requires that any FDA finding that a drug is "'safe and effective' must be based on 'substantial evidence' of expert consensus."  Id.  "The 'test is rigorous,' requiring expensive and time-consuming clinical trials[.]"  Id. at 388–389.

15.     Drug compounding is an exception to the FDCA's premarket approval requirement.  The federal government began regulating drug compounding "[i]n the early 1990's" when "the FDA became concerned that some pharmacies were purchasing bulk quantities of drug products, 'compounding' them into specific drug products before receiving individual prescriptions, and marketing those drugs to doctors and patients." Med. Ctr. Pharmacy, 536 F.3d at 389.  The FDA ultimately concluded "that some pharmacists were manufacturing and selling drugs under the guise of compounding, thereby avoiding the FDCA's new drug requirements."  Thompson, 535 U.S. at 362.

16.     Responding to concerns of regulation avoidance, in 2013, "Congress passed new legislation that once again created federal regulatory power over compounding pharmacies."  Cruz v. Preferred Homecare, No. 2:14-cv-00173-MMD, 2014 WL 4699531, at *3 (D. Nev. Sept. 22, 2014).  This legislation—the Drug Quality and Security Act ("DQSA")—"amend[ed] FDCA Section 503A and add[ed] Section 503B."

5

Allergan USA Inc. v. Imprimis Pharm., Inc., No. 8:17-cv-01551-DOC(JDEx), 2017 WL 10526121 , at *2 (C.D. Cal. Nov. 14, 2017).  The purpose of the DSQA was to improve overall quality and safety of compounded drugs following a 2012 incident in which a drug compounding center "produced contaminated injections that caused a meningitis outbreak, killing more than 60 people and infecting hundreds more."  Athenex Inc. v. Azar, 397 F. Supp. 3d 56, 59 (D.D.C. 2019).

17.    The FDA has issued the following guidance regarding the compounding of FDA approved drugs:

> "Although compounded drugs can serve an important need, they can also pose a higher risk to patients than FDA-approved drugs.  Drug products compounded by outsourcing facilities in accordance with the conditions of section 503B are exempt from FDA drug approval requirements and the requirement to be labeled with adequate directions for use.  There are greater assurances of quality when drugs are compounded by outsourcing facilities that meet the conditions of section 503B and CGMP requirements than there are for drugs compounded by entities that are not required to comply with CGMP requirements and are not routinely overseen by FDA. However, as with all compounded drugs, drugs compounded by outsourcing facilities have not undergone FDA premarket review for safety, effectiveness, and quality, and lack a premarket inspection and finding of manufacturing quality that is part of the drug approval process.  Because they are subject to a lower regulatory standard, compounded drugs should only be distributed to health care facilities or dispensed to patients to fulfill the needs of patients whose medical needs cannot be met by an FDA-approved drug."

Dkt. No. 106–1, Exh. E (hereinafter, "FDA Guidance on 503B 'Essentially a Copy' Requirement").

FDA guidance documents— including the FDA Guidance on 503B "Essentially a

Copy" Requirement—are "documents prepared for FDA staff, applicants/ sponsors, and the public that describe the agency's interpretation of or policy on a regulatory issue." Figy v. Amy's Kitchen, Inc, 37 F. Supp. 3d 1109, 1113 (N.D. Cal. 2014), judgment set aside, 2014 WL 3362178 (N.D. Cal. July 7, 2014) (citing 21 C.F.R § 10.115(b)(1)). "Although guidance documents do not legally bind [the] FDA, they represent the agency's current thinking.  Therefore, FDA employees may depart from guidance documents only with appropriate justification and supervisory concurrence."  21 C.F.R § 10.115(d)(3).  Because FDA guidance documents "represent the agency's current thinking," courts have found them to be persuasive authority.  See, e.g., Ignacuinos v. Boehringer Ingelheim Pharms. Inc., 8 F.4th 98, 104 (2d Cir. 2021) ("Although the FDA's guidance is not binding on this Court, it fully comports with the plain meaning of the regulation, and we find it persuasive.").  Here, because the FDA's guidance comports with the plain meaning of Sections 503A and 503B, the Court finds the FDA Guidance on 503A and 503B to be persuasive authority.

### C.    Section 503A of the FDCA

18.    Section 503A of the FDCA regulates "pharmacy compounding."  21 U.S.C. § 353a.  "Drug products compounded 'for an identified individual patient that are necessary for the identified patient' are exempted from normal-drug approval requirements under Section 503A when certain conditions are met."  Imprimis, 2017 WL 10526121, at *2 (internal alterations omitted) (citing 21 U.S.C. § 353a(a)).  Accordingly, "Section 503A allows pharmacy compounding in two scenarios: (1) drug compounding after the receipt of a prescription; and (2) drug compounding before the receipt of a prescription when the compounding is 'based on a history of receiving valid prescription orders for the compounding of the drug product, which orders have been generated solely within an established relationship between' the compounding pharmacy and the patient or prescribing physician."  Imprimis, 2017 WL 10526121, at *2 (internal alterations omitted) (citing 21 U.S.C. § 353a(a)).

19.     "In both scenarios, Section 503A also requires that the compounded drug is (1) compounded using approved drug products; (2) compounded using ingredients that comply with national standards; (3) not compounded 'regularly or in inordinate amounts (as defined by the Secretary)' if the compounded drug is 'essentially a copy of a commercially available product'; (4) not a drug product whose safety or effectiveness may be adversely effected by compounding; and (5) compounded in a state that has entered into a  Memorandum of Understanding ('MOU') with the FDA or, if no such MOU exists for that state, compounded by a pharmacy or individual that distributes less than '5 percent of its total prescription orders' to out-of-state patients." Imprimis, 2017 WL 10526121, at *2 (internal alterations omitted) (citing 21 U.S.C. § 353a(b)).

20.     "[A]nticipatory mass compounding of standardized drugs in a 503A facility without identified individual patients based on valid prescription orders is clearly violative of the FDCA." Allergan USA, Inc. v. Imprimis Pharm., Inc., 2019 WL 4545960, at *11 (C.D. Cal. Mar. 27, 2019).

21.     As noted above, the FDCA does not permit compounded drugs to be sold or distributed under the 503A exception, a drug that is "compounded 'regularly or in inordinate amounts (as defined by the Secretary)' if the compounded drug is 'essentially a copy of a commercially available product.'" Id. (internal alterations omitted) (citing 21 U.S.C. § 353a(b)).

22.     "This means that a compounded drug product is not eligible for the exemptions in Section 503A if it is (1) essentially a copy of a commercially available drug product, and (2) compounded regularly or in inordinate amounts." Dkt. 106–1, Exh. C (hereinafter, "FDA Guidance on 503A 'Essentially a Copy' Requirement").

23.     A drug is compounded "regularly" if it is "compounded at regular times or intervals, usually or very often." FDA Guidance on 503A "Essentially a Copy" Requirement at 10.  A drug is compounded in "inordinate amounts" if "it is compounded more frequently than needed to address unanticipated, emergency circumstances, or in

1    more than the small quantities needed to address unanticipated, emergency

2    circumstances." Id.

3        24.    A compounded drug may be "essentially a copy of a commercially available

4    drug product" even if it is not an "exact cop[y]" of or "nearly identical" to "a

5    commercially available drug product." Id. at 6.  A drug is "essentially a copy of a

6    commercially available drug product" if (a) the compounded drug and the commercially

7    available drug have the same API, (b) the API has the same, a similar, or an easily

8    substitutable dosage strength, and (c) the commercially available drug product can be

9    used by the same route of administration as the compounded drug.  Id. at 5–6.

10       25.    The "term 'essentially a copy of a commercially available drug product'

11   does not include a drug product in which there is a change, made for an identified

12   individual patient, which produces for that patient a significant difference, as determined

13   by the prescribing practitioner, between the compounded drug and the comparable

14   commercially available drug product."  21 U.S.C. § 353a(b)(2).  If a compounder intends

15   to rely on such a significant difference statement, that determination is to be

16   "documented on the prescription."  FDA Guidance on 503A "Essentially a Copy"

17   Requirement at 8.  The determination is to be made by "a prescriber . . . for the patient

18   for whom [the compounded drug] is prescribed."  Id. at 7; 21 U.S.C. §353a(b)(2).

19       26.    The FDA's guidance indicates that the FDA "does not believe that a

20   particular format is needed to document the determination, provided that the prescription

21   makes clear that the prescriber identified the relevant change and the significant

22   difference that the change will produce for the patient."  FDA Guidance on 503A

23   "Essentially a Copy" Requirement at 8.  The FDA includes the following examples as

24   sufficient to meet the documentation requirement:

25           "No Dye X, patient allergy" (if the comparable drug contains the dye);

26           "Liquid form, patient can't swallow tablet" (if the comparable drug is a

27           tablet);

28

9

"6 mg, patient needs higher dose" (if the comparable drug is only available in 5 mg dose).

Id.  See also Trial Testimony of Kalah Auchincloss.

**D.    Section 503B of the FDCA**

27.    "Section 503B created a new category of drug maker called an 'outsourcing facility.'" Athenex, 397 F. Supp. 3d at 59 (citing 21 U.S.C. § 353b).  "An outsourcing facility may compound drug products in large quantities without obtaining a prescription for 'an identified individual patient.'" Id.  Accordingly, outsourcing facilities "are permitted to sell bulk compounded drug products to health care practitioners and hospitals as 'office stock,' for providers to have available and to use on an as-needed basis." Id.

28.    Pursuant to Section 503B, "[a]n outsourcing facility remains exempt from the FDCA's premarket approval requirements and certain labeling and supply-chain requirements, but only if it satisfies eleven statutory criteria." Id.  These criteria include, inter alia, requirements that: "(1) the drug is not 'essentially a copy of one or more approved drugs;' (2) the drug is not sold wholesale; and (3) the 'drug is compounded in an outsourcing facility in which the compounding of drugs occurs only in accordance with Section 503B.'" Imprimis, 2017 WL 10526121, at *2 (internal alterations omitted) (citing 21 U.S.C. § 353b(a)).

29.    Section 503B "specifically limits the types of drugs that can be compounded at outsourcing facilities" to "compound bulk drug substances that appear on (1) a list established by the FDA identifying bulk drug substances for which there is a clinical need (hereinafter sometimes referred to as the "503B bulks list"); or (2) a drug shortage list established by the FDA." Id.

30.    An additional limitation is that the compounded drug must not be "essentially a copy of one or more approved drugs."  21 U.S.C. § 353b(a).  Similar to Section 503A, Section 503B defines "essentially a copy of an approved drug" as "a drug, a component of which is a bulk drug substance that is a component of an approved drug

10

. . . unless there is a change that produces for an individual patient a clinical difference, as determined by the prescribing practitioner, between the compounded drug and the comparable drug." 21 U.S.C. § 353b(d)(2)(B).  "If a component of the compounded drug is a bulk drug substance that is also a component of an approved drug, the compounded drug product is essentially a copy of an approved drug, and cannot be compounded under Section 503B, unless there is a prescriber determination of clinical difference[.]"  FDA Guidance on 503B "Essentially a Copy" Requirement.

31.     If a compounder intends to rely on a "clinical difference statement" to establish that a compounded drug is not essentially copy of an approved drug, the statement is to be "noted on the prescription or order (which may be a patient-specific prescription or a non-patient specific order) for the compounded drug."  Id. at 8.  The statement is to "specif[y] the change between the compounded drug and the comparable approved drug and indicate[] that the compounded drug will be administered or dispensed only to a patient for whom the change produces a clinical difference, as determined by the prescribing practitioner for that patient."  Id. at 9; 21 U.S.C. § 353b(d)(2)(B).

### E.     Compounding of Sodium Thiosulfate

32.     Hope manufactures and sells a Sodium Thiosulfate Injection, an FDA-approved intravenous solution with sodium thiosulfate as its API, in a concentration of 12.5g/50mL.  Final Pretrial Conf. Order at 2:7–9.  Hope's Sodium Thiosulfate Injection is the only FDA-approved drug with sodium thiosulfate as an API.  Id. at 2:10–11.

33.     In 2012, the FDA approved Hope's Sodium Thiosulfate Injection as a treatment for acute cyanide poisoning.  Id. at 2:12–13.

34.     Defendants also manufacture and sell drugs containing sodium thiosulfate as an API.   Deposition Testimony of T.J. Bresnahan and Carl Woetzel.  Defendants have always used the same formulation for their sodium thiosulfate drugs.  Id. Defendants' sodium thiosulfate drugs contain the same API as Hope's Sodium

Thiosulfate Injection, in the same concentration as in Hope's Sodium Thiosulfate Injection. Id.;  Trial Testimony of Dr. Sherman.

35.     Defendants have not applied for or received approval for their sodium thiosulfate drugs from the FDA, any state, or any state agency.  Final Pretrial Conf. Order at 2:17–18; Trial Testimony of Jason McGuire.

36.     Defendants claim to manufacture and sell their sodium thiosulfate drugs under the FDA regulations for compounding.  The federal requirements for drug compounding are set forth in FDCA Sections 503A and 503B, as described above.

37.     From September 2014 until the present, the 503B defendants operated two outsourcing facilities in Wichita, Kansas that prepared compounded sodium thiosulfate drugs which they claimed to be exempt from FDA approval under Section 503B. Deposition Testimony of Carl Woetzel.  The 503B defendants compounded their sodium thiosulfate drugs in their outsourcing facilities after the enactment of Section 503B, 21 U.S.C. § 353b, and the 503B defendants' registration as outsourcing facilities.  Final Pretrial Conf. Order at 3:11–12.

38.     During the same time period, Anazao operated a "compounding pharmacy" in Tampa, Florida, that prepared compound sodium thiosulfate drugs which it claimed to be exempt from FDA approval under Section 503A.  Deposition Testimony of T.J. Bresnahan.  The sodium thiosulfate drugs Anazao compounded in its Tampa pharmacy have not been approved by the FDA, any state, or any state agency.  Final Pretrial Conf. Order at 2:21–22.

**F.     Sale of Sodium Thiosulfate**

39.     Dialysis clinics purchase medications containing sodium thiosulfate for use in treating calciphylaxis in dialysis patients.  Trial Testimony of Dr. Sherman.

40. During the period from September 2014 to the present, Hope sold its Sodium Thiosulfate Injection to customers throughout the United States, including to dialysis clinics in the five states.  Trial Testimony of Dr. Sherman; Exh. 683.  Defendants' two

12

largest customers of its sodium thiosulfate drug are dialysis providers Fresenius and DaVita.  Final Pretrial Conf. Order at 2.

41.     From November 2017 until at least November 2019, Anazao sold a sodium thiosulfate drug from its 503A compounding pharmacy in Tampa, Florida, to dialysis providers (including to dialysis companies located in each of the five states).  Exhs. 582, 610.

42.     During the period from September 2014 to the present, the 503B defendants sold sodium thiosulfate drugs to dialysis providers Fresenius and DaVita in each of the five states.  Exhs. 540, 540A, 693, 693A.

43.     Before September 2018, Fresenius ordered sodium thiosulfate drugs pursuant to a company-wide policy that "[s]odium thiosulfate is ordered through JCB Laboratories."  Exhs. 517–518.

44.     Before September 2018, DaVita purchased all of its sodium thiosulfate drugs from defendants and did not purchase Hope's FDA-approved Sodium Thiosulfate Injection.  Trial Testimony of Dr. Sherman; Exhs. 540, 540A.

45.     During the period October 2018 to March 2019, the 503B defendants stopped selling compounded sodium thiosulfate drugs after defendants' compounded sodium thiosulfate failed quality inspections due to the presence of visible particulates in vials of the medication.  Exhs. 540A, 867, 881, 887–888.

46.     From October 2018 to March 2019, when the 503B defendants were not selling compounded sodium thiosulfate drugs, Fresenius and DaVita turned to Hope for their sodium thiosulfate drug needs to the extent those needs could not be met by Anazao.  Trial Testimony of Dr. Sherman; Exhs. 610, 835, 870.

47.     In October 2018, Fresenius's senior manager for pharmaceutical sourcing and analytics told defendants that Fresenius would "take a financial hit of $500K to $900K if [Fresenius had] to go through Hope Pharma and this situation [the unavailability of Defendants' compounded STS] goes 4 to 8 weeks."  Exh. 528.

48.     In November 2018, this same Fresenius executive wrote that if defendants "can't meet all our demands," certain Fresenius clinics would have to "order from Hope at significantly higher cost." Exh. 529. And in the same email chain, he wrote: "The challenge we will have is if only a small portion of our demand can be met by Anazao (10%?) how I can juggle sending some clinics to Anazao and the remainder over to Hope Pharma . . ." Id.

49.     In comparison with the seven-month period from September 2018 to March 2019, when the 503B defendants were largely out of the market for STS, and the seven month period that preceded it, Hope's sales of sodium thiosulfate were 44% higher in California, 146% higher in Connecticut, 67% higher in Florida, 134% higher in South Carolina, and 118% higher in Tennessee. Exh. 883; Exh. 835; Trial Testimony of Dr. Sherman.

50.     In September 2020, DaVita decided to "not us[e defendants'] product going forward." Deposition Testimony of Dr. George Aronoff.

51.     Defendants' sodium thiosulfate drug has been out of stock at other times, including September 2020 and June 2021. Trial Testimony of Jason McGuire. During those times, Fresenius clinics have ordered sodium thiosulfate from Hope. Trial Testimony of Dr. Sherman.

52.     Some purchasers of defendants' sodium thiosulfate drugs have confused defendants' sodium thiosulfate drugs with Hope's Sodium Thiosulfate Injection. In May 2019, an employee of a Tennessee medical facility sent faxes and emails to Hope, asking about the status of a late shipment of defendants' sodium thiosulfate drugs. Trial Testimony of Dr. Sherman; Exh. 853. The purchase order number indicated that this order had actually been placed with JCB, not with Hope. Id. Hope has also received orders for defendants' compounded sodium thiosulfate drugs and inquiries about orders that had been placed with defendants. Trial Testimony of Dr. Sherman; Exhs. 852, 926.

**G. Facts Relevant to Defendants' Violation of 503A**

53.     The sodium thiosulfate drug produced in Anazao's Tampa pharmacy has the same API, the same dosage strength (12.5gm/50mL), and the same route of administration (intravenous injection) as Hope's Sodium Thiosulfate Injection. Deposition Testimony of T.J. Bresnahan; Trial Testimony of Dr. Sherman; Exh. 617.

54.     With respect to the 63 orders for DaVita filled by Anazao based on prescriptions, while a handful of prescriptions contain language that may indicate that the prescriber identified a preference for a compounded potassium-free product, the prescriptions do not specifically identify the relevant change nor the significant difference that change will produce for individual patients.  Exh. 925.  Moreover, the majority of the prescriptions did not contain any language suggesting that the prescriber had indicated any preference for potassium-free or compounded products.  Exh. 925; Trial Testimony of Sue Heinemann.

55.     The forms created by defendants for Fresenius contain the pre-printed statement: "By submitting this prescription, you acknowledge that you have evaluated commercially available drug product options and determined that this compounded preparation is clinically necessary for the patient identified above."  Exh. 588.  Anazao filled 231 orders for Fresenius based on these forms.  Exh. 582.

56.     According to the testimony of Anazao's Rule 30(b)(6) designee and President, when the 503B defendants halted their production of sodium thiosulfate drugs in September 2018, Anazao began compounding a potassium-free product that Anazao claimed to be necessary for some patients "based on Fagron and JCB's historical volumes of sodium thiosulfate sales."  Deposition Testimony of T.J. Bresnahan.  Anazao "ramped up whatever [Anazao] could to satisfy their [Fagron's and JCB's] patient needs" during this time period.  Id.

**H . Facts Relevant to Defendant's Violation of 503B "Bulks List"**

57.     Bulk sodium thiosulfate has never appeared on the 503B bulks list, and Hope's Sodium Thiosulfate Injection has not appeared on the drug shortage list.  21 U.S.C. § 353b(a)(2)(A).

58.     While developing the 503B bulks list, however, the FDA issued an interim policy stating that it "does not intend to take action against an outsourcing facility for compounding a drug using a bulk drug substance . . . if, among other conditions, the substance appears on a list of 'Category 1' substances that are currently under evaluation."  Exh. 551; Athenex Pharma Cols., LLC v. Par Pharm., Inc., 2019 WL 4511914, at *2 (W.D.N.Y. July 9, 2019).  Sodium thiosulfate appeared on the FDA's Category 1 list from October 30, 2019 to July 31, 2020.  Final Pretrial Conf. Order at 3:15–16.

59.     From August 2019 until October 30, 2019, STS appeared on the Category 3 list, which includes substances nominated to the 503B bulks list without sufficient supporting information.  Dkt. 151 at 16–17.  There is no similar FDA exception for drugs listed on the Category 3 list as there is for drugs listed on the Category 1 list.  Id.

60.     On July 31, 2020, the FDA published a Notice in the Federal Register, proposing that sodium thiosulfate not be included on the 503B bulks list because it "f[ound] no basis to conclude that there is a clinical need for outsourcing facilities to compound drug products using . . . sodium thiosulfate."  Exh. 570; 85 Fed. Reg. 46139, 46141 (July 31, 2020).  The FDA rejected as "inaccurate" the claim that the potassium in "the FDA-approved product makes it medically unsuitable to treat patients with calciphylaxis."  Id. at 46139.

**I.     Facts Relevant to Defendants' Violation of 503B "Essentially a Copy" Provision**

61.     In 2017, defendants became concerned that their sodium thiosulfate drug may be found to be "essentially a copy" of Hope's Sodium Thiosulfate Injection in violation of FDCA Sections 503A and 503B.  Exh. 616.  Defendants explored several approaches to justify selling their sodium thiosulfate compounded drug, including changing their sodium thiosulfate's formulation to be 10 percent different from Hope's drug; selling their drug in a 100 mL vial instead of the 50mL used by Hope, and asserting that Hope's drug might be dangerous because Hope offered its sodium

16

thiosulfate drug in a package that also contained sodium nitrite.  Exhs. 590, 616, 628, 860.

62.  In September 2017, Jason McGuire, Fagron's Vice President of Quality and Regulatory, decided that Fagron could use the presence of potassium in Hope's product to justify the compounding and sale of defendants' drug to dialysis clinics.  Defendants did not present evidence that any prescribing practitioner approached defendants requesting a potassium-free version of sodium thiosulfate.  Trial Testimony of Jason McGuire.

63.  However, upon discussions with defendants, business executives at the dialysis clinics operated by Fresenius and DaVita wrote to the FDA describing a professed need for a potassium-free sodium thiosulfate injection at their dialysis clinics. Exhs. 24, 26.  One of these executives, Dr. George Aronoff, Vice President of Clinical Affairs at DaVita Kidney Care, is not a prescribing practitioner.  Exh. 26; Deposition Transcript of Dr. George Aronoff.  Similarly, the other executive, Dr. Jeffrey L. Hymes, the Senior Vice President for Fresenius Kidney Care, is also not a prescribing practitioner.  Exh. 24; Deposition Testimony of Dr. Hymes.

64.  Defendants never received any attestation form or other clinical difference statement signed by a prescribing practitioner or a person authorized to act on a practitioner's behalf at DaVita to support these sales. Deposition Testimony of Carl Woetzel; Trial Testimony of Jason McGuire and Sue Heinemann.

65.  Defendants provided various attestation forms to Fresenius for Fresenius clinic personnel to sign beginning in September 2018.  Exh. 923.  No such forms existed at any time prior to September 2018.  Id.

66.  Defendants received two attestation forms from Fresenius clinic personnel in 2018.  Neither attestation was signed by a prescribing practitioner or a person authorized to act on a practitioner's behalf.  Exh. 923; Trial Testimony of Sue Heinemann.

67.     Defendants received 42 attestation forms signed by Phu Pham, a Fresenius employee who works at a Fresenius finance center, dated between April 2, 2019 and October 22, 2019.  Id.

68.     In October 2019, defendants received four blanket attestation forms (forms which included attestations for multiple facilities) and one additional blanket attestation form dated December 30, 2019, signed by employees who work at Fresenius finance centers.  Id.

69.     In 2020, defendants received six more blanket attestation forms signed by employees who work at Fresenius finance centers.  Exh. 923.  These forms were signed by Phu Pham, Accounting Supervisor, and Keiola Peterson and Tamekka Grant, Accounting Representatives/IntelliOrder Coordinators.  Id.; see also Exhs. 744, 745.

70.     On July 9, 2020, Fagron requested from Fresenius three blanket attestations from each of Fresenius's East, West, and South Divisions.  Exh. 702.  In response, Fresenius sent the 503B defendants an attestation form dated July 7, 2020, on behalf of 422 Fresenius clinics in 20 states.  Exh. 745.  This attestation was signed by Keiola Peterson, a Fresenius Accounting Rep/Intelli-Order Coordinator.  Id.

71.     Starting in July 2020, after this Court issued its preliminary injunction, Fagron first received attestation forms from Fresenius signed by personnel on behalf of individual clinics: 177 between July 2020 and June 2021. Exh. 923; Trial Testimony of Sue Heinemann.  With few exceptions, most of these personnel were not prescribing practitioners, nor was it apparent that they had the authority to act on behalf of a prescribing practitioner.  After the preliminary injunction was issued, defendants also modified the language of their attestation forms to include additional statements regarding potassium and clinical difference, as described below.  See Exh. 923.

72.     Prior to the issuance of the preliminary injunction, defendants' attestation forms contained language such as: "By signing this document, the signatory hereby attests that he/she has the authority to speak on behalf of practitioners who will administer the compounded preparation(s) to which this attestation applies. Additionally,

18

by signing this document, the signatory hereby attests that the compounded preparation(s) to which this attestation applies will only be administered to patients for whom the practitioner determines will produce a clinical difference from the comparable approved drug product, as described more fully in the applicable attestation below." Exhs. 695–696. The forms go on to state, for the drugs listed therein, including sodium thiosulfate, "in my professional judgment, this compounded product provides clinical and safety benefits relative to the comparable commercially available drug products, which is medically necessary for patients who require this compounded formulation." Id.

73.     Prior to the issuance of the preliminary injunction, none of the attestation forms received by the 503B defendants were signed by a person whose title clearly indicates they had prescribing authority.  Exh. 923–1 through 923–213; Trial Testimony of Sue Heinemann.

74. After the Court issued the preliminary injunction, Fagron modified its attestation forms.  Defendants' modified attestation form V2020-03 states:

> "The compounded Sodium Thiosulfate injection solution is free of boric acid and potassium chloride compared to comparable commercially available drug products.  In my professional judgement, this compounded product provides clinical and safety benefits relative to the comparable commercially available drug products, which is medically necessary for patients who require this compounded formula."  Exh. 923-215.

Defendants modified the language of the attestation again in V2021-01 to include the phrase: "in the professional judgement of the prescriber . . ."  Exh. 923–947.

Additionally, after the preliminary injunction, the majority of the clinic attestation forms were signed by registered nurses and clinical managers rather than accounting supervisors.  See Exh. 923 at 229, 237, 253, 313, 329, 345, 353, 427.

## III.    CONCLUSIONS OF LAW

19

1    1.    Hope bears the burden of proving by a preponderance of the evidence each
2    element of its claims.  S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 888 (9th Cir.
3    2003).  Defendants bear the burden of proving each element of their defenses.  The Court
4    finds and concludes that Hope has met its burden of proof with respect to its claim that
5    defendants' distribution and sale of sodium thiosulfate drugs violated the FDCA and did
6    not come within the exceptions provided by Sections 503A or 503B, and that defendants
7    have not established any valid defenses.

8    **B.    Conclusions of Law Related to Section 503A**

9    2.    The Court finds and concludes that the prescription forms produced by
10   Anazao do not contain qualifying significant difference statements because the forms do
11   not reflect "a change, made for an identified individual patient, which produces for that
12   patient a significant difference, as determined by the prescribing practitioner, between
13   the compounded drug and the comparable commercially available drug product."  21
14   U.S.C. § 353a(b)(2).

15   3.    With respect to the 63 orders by DaVita filled by Anazao between
16   December 2017 and October 2019, while a few of the prescriptions contain language that
17   appears to indicate that the prescriber identified a preference for a potassium-free or
18   compounded product, the prescriptions do not explicitly state that the prescriber
19   identified a change between the compounded drug and the comparable approved drug
20   and the significant difference that the change will produce for the patient.  Exh. 925.
21   Moreover, the majority of the DaVita prescriptions do not contain any language
22   suggesting that the prescriber has indicated a preference for a potassium-free or
23   compounded product.  Exh. 925; Trial Testimony of Sue Heinemann.

24   4.    The sodium thiosulfate drug manufactured and sold by Anazao's 503A
25   pharmacy is "essentially a copy of" Hope's Sodium Thiosulfate Injection, "a
26   commercially available product."  21 U.S.C. § 353a(b).  Therefore, Anazao could not
27   compound defendants' sodium thiosulfate drug consistent with Section 503A's
28   essentially a copy prohibition unless "there is a change, made for an identified individual

20

patient, which produces for that patient a significant difference, as determined by the prescribing practitioner, between the compounded drug and the comparable commercially available drug product." 21 U.S.C. § 353a(b)(2).

5.     The Court finds and concludes that Anazao did not compound its sodium thiosulfate drug consistent with Section 503A's "essentially a copy" prohibition. Anazao fulfilled orders for Fresenius which contained generic statements in a pre-printed form stating that purchasers "acknowledge that [they] have evaluated commercially available drug product options and determined that this compounded preparation is clinically necessary for the patient identified above." Exh. 588.  These statements do not reflect "a change, made for an identified individual patient, which produces for that patient a significant difference, as determined by the prescribing practitioner, between the compounded drug and the comparable commercially available drug product." 21 U.S.C. § 353a(b)(2).

6.     The Court further finds and concludes that Anazao compounded its sodium thiosulfate drug "regularly or in inordinate amounts." 21 U.S.C. § 353a(b).  Anazao compounded its sodium thiosulfate drug "regularly" because it did so "at regular times or intervals, usually or very often."  FDA Guidance on 503A "Essentially a Copy" Requirement at 10.  Anazao also compounded its sodium thiosulfate drug "in inordinate amounts" because it did so "more frequently than needed to address unanticipated, emergency circumstances, or in more than the small quantities needed to address unanticipated, emergency circumstances."  Id.

7.     Because Anazao compounded "regularly or in inordinate amounts" a drug that was "essentially a copy" of Hope's Sodium Thiosulfate Injection, Anazao's compounding of sodium thiosulfate was not exempted from the requirements for FDA premarket approval.  21 U.S.C. § 355.

8.     Anazao's compounding of sodium thiosulfate was not exempt from FDA premarket approval under Section 503A because Anazao did not compound its sodium thiosulfate drug "based on a history of the licensed pharmacist . . . receiving valid

prescription orders for the compounding of the drug product" based on an "established relationship" between the pharmacist and either the patient or the prescribing physician. 21 U.S.C. 353a(a)(2).

9.      In September 2018, when the 503B defendants stopped manufacturing their sodium thiosulfate drug, Anazao began compounding based on the 503B defendants' historical sales volume, not based on Anazao's pharmacists "receiving valid prescription orders . . . generated solely within an established relationship between" Anazao's pharmacists and the "individual patient for whom the prescription order will be provided" or "the physician or other licensed practitioner who will write such prescription order." 21 U.S.C. § 353a(a)(2)(B).  Rather, Anazao "ramped up" as fast as it could "to satisfy [Fagron and JCB's] patient needs."  Deposition Testimony of T.J. Bresnahan.  These sales thus did not comply with Section 503A.

**C.      Conclusions of Law Related to Section 503B "Essentially a Copy" Provision**

10.      The Court concludes that the 503B defendants sold in the five states a sodium thiosulfate drug that has not received approval from the FDA, any state, or any state agency.

11.      The Court concludes that the sodium thiosulfate drug manufactured and sold by the 503B defendants is "essentially a copy" of Hope's Sodium Thiosulfate Injection, an "approved drug[]."  21 U.S.C. § 353b(a).

12.      The 503B defendants did not compound their sodium thiosulfate drug based upon prescriber determinations of clinical difference.

13.      Defendants' blanket attestation forms do not take defendants' sodium thiosulfate drug outside of the prohibition against selling drugs that are essentially a copy of commercially available drugs. These forms were not signed or authorized by prescribing practitioners for the patients, nor do they reflect that "there is a change that produces for an individual patient a clinical difference, as determined by the prescribing

1   practitioner, between the compounded drug and the comparable approved drug."  21

2   U.S.C. § 353b(d)(2)(B).

3        14.    The vast majority of attestations provided to 503B defendants from

4   Fresenius were not made by patients' prescribing practitioner and thus do not take

5   defendants' sodium thiosulfate drug outside the prohibition against selling drugs that are

6   essentially a copy of commercially available drugs.  Most of the attestations were signed

7   by accounting supervisors without the authority to make medication-related decisions.

8   Exh. 923.  Even after defendants began obtaining attestations signed by clinical

9   personnel, many were not signed by practitioners with prescribing authority, and many

10  of those that were signed by clinic personnel did not sufficiently document that they had

11  authority to speak on behalf of physicians who had prescribed sodium thiosulfate drugs

12  for their patients.  Id.

13       15.    With respect to DaVita's purchases of the 503B defendants' sodium

14  thiosulfate drugs, the 503B defendants received no determinations of clinical difference

15  at all with respect to those purchases.  As such, none of DaVita's purchases satisfied the

16  "essentially a copy requirement" of 503B.

17       16.    Defendants submitted evidence intended to show that their sodium

18  thiosulfate drug has a clinical difference for at least some dialysis patients because

19  defendants' STS drug does not include potassium, while Hope's Sodium Thiosulfate

20  Injection includes potassium as an excipient.  Trial Testimony of Jason McGuire.  Hope

21  presented evidence that defendants explored several bases for avoiding the "essentially a

22  copy" prohibition prior to arriving at their claimed absence of potassium approach.

23  Exhs. 590, 616, 628, 860.  The Court need not resolve whether the absence of potassium

24  might make a clinical difference for some patients, because even if it did, defendants

25  failed to prove that they produced and sold their sodium thiosulfate drug pursuant to a

26  determination by a prescribing practitioner that there is "a change that produces for an

27  individual patient a clinical difference . . . between the compounded drug and the

28  comparable approved drug."  21 U.S.C. § 353b(d)(2)(B).

17.     The relevant question under Section 503B is not whether defendants' sodium thiosulfate drug could have a clinical difference from Hope's Sodium Thiosulfate Injection for some patients, but rather whether the prescribing practitioner has made a determination of "a clinical difference . . . between the compounded drug and the comparable approved drug." Id.  There is no such statement of clinical difference as determined by a prescribing practitioner submitted with most of Fresenius's attestation forms.

18.     After this Court issued its preliminary injunction, defendants sought to obtain individual attestation forms instead of blanket attestations forms from Fresenius in order to comply with the injunction.  Exh. 923.  Additionally, defendants modified the language of their clinical difference statement for sodium thiosulfate on their template attestation forms to emphasize the necessity of an absence of potassium.  Id.  However, regardless of these changes, only a small number of these forms signed after the preliminary injunction was issued were signed by a prescribing practitioner or someone who had the authority to act on behalf of a prescribing practitioner.  Id.

## C.     Conclusions of Law Related to 503B "Bulks List"

19.     Before the FDA added sodium thiosulfate to its Category 1 list on October 30, 2019, the compounded drugs produced in the 503B defendants' outsourcing facilities were not exempted from the premarket approval requirement, 21 U.S.C. § 355, because they were made in an outsourcing facility and used bulk drug substances for which the Secretary of Health and Human Services had not determined there is a clinical need for use in compounding.  21 U.S.C. § 353b(a)(2)(A).

20.     The FDA's Interim Policy on Compounding states that "the FDA does not intend to take action against an outsourcing facility for compounding a drug using a bulk drug substance that does not appear on the 503B bulks list" if the drug meets certain conditions including that it appears on the 503B Category 1 List and "is compounded in compliance with all other provisions of section 503B." Id.  at 8.

24

21.     Regardless of whether defendants' compounding and sale of their sodium thiosulfate drugs between October 30, 2019 and July 31, 2020 while Sodium Thiosulfate was on the Category 1 List satisfied the Section 503B bulks list requirement, the defendants were in violation of the other provisions of Section 503B.  Because almost all of the attestations defendants' received failed to include a clinical difference statement signed or approved by a prescribing practitioner, defendants violated the "essentially a copy" provision of Section 503B during the period from September 2014 to the present, including the period from October 30, 2019 to July 31, 2020 when Sodium Thiosulfate was on the Category 1 List.

### E.     Conclusions of Law Related to California's UCL

22.     Hope has satisfied its burden of proving by a preponderance of the evidence that defendants violated California's UCL, as alleged by Hope.

23.     To succeed on its UCL claim, Hope must prove (1) defendants engaged in an unlawful, unfair, or fraudulent business act or practice, (2) Hope suffered a loss or deprivation of money, and (3) the economic injury was caused by the defendants' unlawful or unfair business practice.  Kwikset Corp. v. Superior Ct., 51 Cal. 4th 310, 322 (2011); Lippitt v. Raymond James Fin. Servs., Inc., 340 F.3d 1033, 1043 (9th Cir. 2003).

24.     The Court concludes that defendants' conduct was "unlawful" under the UCL because it violated California's Sherman Law.  The UCL's "unlawful" prong incorporates and makes independently actionable violations of other state statutes, including the Sherman Law.  Allergan USA, Inc. v. Imprimis Pharm., Inc., 2017 WL 10526121, at *12 (C.D. Cal. Nov. 14, 2017).

25.     The Sherman Law provides that "[n]o person shall sell, deliver, or give away any new drug" unless (1) "a new drug application has been approved for it . . . under [FDCA] Section 505" or (2) California "has approved a new drug . . . application for that new drug."  Cal. Health & Safety Code § 111550(a)-(b).  Defendants violated the Sherman Law because, they sold in California their sodium thiosulfate drug, which has neither been approved by the FDA "under [FDCA] Section 505," nor by California.  Id.

25

26.     For the reasons given above, defendants violated the FDCA because their compounding and sale of their sodium thiosulfate drug were not made pursuant to an approved application or an exception to such approval.

27.     Hope suffered a loss or deprivation of money caused by defendants' unlawful conduct.  "When two competitors split a market, such that one's lost sales are likely the other's gains, . . . 'it is reasonable to presume that every dollar defendant makes has come directly out of plaintiff's pocket.'"  K&N Eng'g, Inc. v. Spectre Performance, 2012 WL 12893797, at *6 (C.D. Cal. Aug. 2, 2012).

28.     Here, because Hope and defendants were the only providers of sodium thiosulfate drugs, this presumption supports a finding that defendants' sales caused Hope to lose at least some sales that Hope would have made but for defendants' unlawful conduct.  The Court thus finds that defendants caused Hope financial loss in the form of lost sales of Hope's Sodium Thiosulfate Injection.

29.     The Court finds and concludes that defendants violated the UCL and plaintiffs are thus entitled to declaratory and equitable relief under the UCL.  Notably, under the UCL, a plaintiff is not entitled to damages or disgorgement when the profits realized by the defendants are not derived from property taken from the plaintiff.  Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1132 (2003) (holding that disgorgement of profits realized by a competitor is not a restitutionary remedy).

**F.     Conclusions of Law Related to FDUTPA**

30.     Hope has satisfied its burden of proving by a preponderance of the evidence that defendants violated FDUTPA, as alleged by Hope.

31.     To succeed on its claim under FDUTPA, Hope must prove (1) that defendants engaged in unfair or deceptive practice, (2) causation, and (3) actual damages.  Glob. Tech Led, LLC v. Hilumz Int'l Corp., 2017 WL 588669, at *8 (M.D. Fla. Feb. 14, 2017); Wright v. Emory, 41 So. 3d 290, 292 (Fla. 4th DCA 2010)).

32.     Defendants' conduct was "unfair" under FDUTPA.  Under FDUTPA, a business practice is "unfair" if it "'offends [Florida's] established public policy.'"  State

*Farm Mut. Auto Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC*, 278 F. Supp. 3d 1307, 1326 (Fla. 4th DCA 2010).  Here, that public policy is expressed in the Florida Drug and Cosmetic Act, which provides that "[a] person may not sell, offer for sale, hold for sale, manufacture, repackage, distribute, or give away any new drug unless an approved application has become effective under s. 505 of the [FDCA] or unless otherwise permitted by the Secretary of the United States Department of Health and Human Services for shipment in interstate commerce."  Fla. Stat. § 499.023.

33.     For the reasons given above, defendants violated the FDCA because their compounding and sale of their sodium thiosulfate drug were not made pursuant to an approved application or an exception to such approval.

34.     Defendants argue that Hope must prove that defendants' conduct has caused harm to Florida consumers.  Assuming that FDUTPA requires Hope to prove consumer harm, the Court finds that Hope has done so.  Hope has proven that defendants' sales have caused at least some consumer confusion as to the source of defendants' sodium thiosulfate drugs.  Consumer confusion qualifies as consumer harm under FDUTPA. *Wyndham Vacation Resorts, Inc. v. Timeshares Direct, Inc.*, 123 So. 3d 1149, 1152 (Fla. DCA 2012).  In addition, the sale of a product that is unlawfully on the market qualifies as consumer harm under FDUTPA.  *Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1085 (11th Cir. 2019).

35.     Hope is entitled to declaratory and equitable relief under the FDUTPA. However, because Hope chose to waive any claims for damages and only seeks equitable restitution of ill-gotten profits, dkt. 341, and because damages were available as an adequate remedy at law under the FDUTPA, the Court finds and concludes that Hope is not entitled to equitable restitution under the FDUTPA.  *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 845 (9th Cir. 2020).

### G.    Conclusions of Law Related to TCPA

36.     Hope has satisfied its burden of proving by a preponderance of the evidence that defendants violated TCPA, as alleged by Hope.

27

37.    To succeed on its TCPA claim, Hope must prove (1) defendants engaged in an unfair or deceptive act or practice declared unlawful by the TCPA and (2) defendants' conduct caused an "ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated." Tucker v. Sierra Builders, 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005) (citing Tenn. Code Ann. § 47–18–109(a)(1)).

38.    Defendants' conduct was "unfair" under TCPA.  The TCPA provides that "advertising, promoting, selling or offering for sale any good or service that is illegal or unlawful to sell in the state" is unfair or deceptive.  Tenn. Code Ann. § 47-18-104(b)(44)(C).  The Court finds that defendants' sodium thiosulfate drug was "illegal or unlawful" to sell in Tennessee because the Tennessee Food, Drug and Cosmetic Act prohibits the sale of "any new drug unless an application with respect to the drug has become effective under § 505 of the [FDCA]."  Tenn. Code Ann. § 53-1-110(a). Because defendants' sodium thiosulfate drug was not approved "under § 505," id., the Court finds it was unlawful to sell those drugs in Tennessee under the Tennessee Food, Drug and Cosmetic Act.

39.    For the reasons given above, defendants violated the FDCA because their compounding and sale of their sodium thiosulfate drug were not made pursuant to an approved application or an exception to such approval.

40.    Defendants' conduct caused Hope an "ascertainable loss of money or property," Tucker, 180 S.W.3d at 115, in the form of lost sales as explained above.

41.    Hope is entitled to declaratory and equitable relief under the TCPA. However, because Hope chose to waive any claims for damages and only seeks equitable restitution of defendants' ill-gotten profits, dkt. 341, and because damages were available as an adequate remedy at law under the TCPA, the Court finds and concludes that Hope is not entitled to equitable restitution under the TCPA.  Sonner, 971 F.3d at 845.

## H.    Conclusions of Law Related to SCUTPA

28

42.     Hope has satisfied its burden of proving by a preponderance of the evidence that defendants violated SCUTPA, as alleged by Hope.

43.     To succeed on its SCUTPA claim, Hope must prove that (1) defendants engaged in an unfair or deceptive trade practice, (2) Hope suffered actual, ascertainable losses as a result of the defendants' use of the unlawful trade practice, and (3) the unlawful trade practice engaged in by the defendants had an adverse impact on the public interest.  Williams v. Quest Diagnostics, Inc., 353 F. Supp. 3d 432, 450 (D.S.C. 2018).

44.     Defendants' conduct was "unfair" under SCUTPA.  Under SCUTPA, a business practice is "unfair" if it offends South Carolina's "public policy created by . . . legislative enactments."  Id.  Here, that public policy is expressed in the South Carolina Drug Act, which provides that "[n]o person shall introduce or deliver for introduction into intrastate commerce any new drug unless" the South Carolina Commissioner of Health and Environmental Control has approved the drug or "an application with respect thereto has been approved . . . under Section 505 of the [FDCA]."  S.C. Code § 39-23-70(a)-(b).  Defendants violated the South Carolina Drug Act because they sold in South Carolina their sodium thiosulfate drug, which had not been approved by the Commissioner or by the FDA "under Section 505 of the [FDCA]."  Id.

45.     For the reasons given above, defendants violated the FDCA because their compounding and sale of their sodium thiosulfate drug were not made pursuant to an approved application or an exception to such approval.

46.     The Court further finds that defendants' conduct caused Hope actual, ascertainable losses in the form of lost sales as explained above.

47.     Finally, defendants' conduct had an adverse impact on the public interest. "An impact on the public interest may be shown if the acts or practices have the potential for repetition."  Williams, 353 F. Supp. 3d at 450.  "Potential for repetition may be demonstrated, among other ways, by showing that (1) the same kind of actions occurred in the past, thus making it likely they will continue to occur absent deterrence, and (2)

29

the company's procedures create a potential for repetition of the unfair and deceptive acts." Id.  In light of defendants' conduct following the issuance of the preliminary injunction, and defendants' prior conduct, the Court finds that there is a potential for repetitive, unfair, and deceptive action.

48.     Hope is entitled to declaratory and equitable relief under the SCUTPA. However, because Hope chose to waive any claim for damages and only seeks equitable restitution of ill-gotten profits, dkt. 341, and because damages were available as an adequate remedy at law under the SCUTPA, the Court finds and concludes that Hope is not entitled to equitable restitution under the SCUTPA.  Sonner, 971 F.3d at 845.

## I.     Conclusions of Law Related to CUTPA

49.     Hope has satisfied its burden of proving by a preponderance of the evidence that defendants violated CUTPA as alleged by Hope.

50.     To succeed on its CUTPA claim, Hope must prove that (1) defendants' conduct was in the course of their primary trade or commerce; (2) the conduct, "without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise," meaning that it (a) "is within at least the penumbra of some common law, statutory, or other established concept of unfairness"; (b) "is immoral, unethical, oppressive, or unscrupulous"; or (c) "causes substantial injury to consumers, [competitors or other businesspersons]"; and (3) Hope suffered "any ascertainable loss of money or property, real or personal, as a result of the use or employment of a [prohibited] method, act or practice."  Ulbrich v. Groth, 310 Conn. 375, 409–10 (2013).

51.     The Court finds defendants' conduct was in the course of their primary trade or commerce.  Defendants' conduct "offend[ed] public policy as it has been established by statutes," id., specifically Connecticut's Food, Drug and Cosmetic Act, which provides that "[n]o person shall sell, deliver, offer for sale, hold for sale or give away any new drug unless . . . an application with respect thereto has been approved under Section 355 of the [FDCA]."  Conn. Gen. Stat. § 21a–110.  "Section 355 of the

30

[FDCA]," as referenced in this statute, is Section 505 of the FDCA, and is codified at 21 U.S.C. § 355.  Accordingly, defendants violated the Connecticut Food, Drug, and Cosmetic Act by selling in Connecticut their sodium thiosulfate drug, which has not been "approved under Section 355 of the [FDCA]."  Conn. Gen. Stat. § 21a–110.

52.     For the reasons given above, defendants violated the FDCA because their compounding and sale of their sodium thiosulfate drug were not made pursuant to an approved application or an exception to such approval.

53.     Defendants' conduct caused Hope an "ascertainable loss of money or property," in the form of lost sales as explained above.  Ulbrich, 310 Conn. at 409–10.

54.     Hope is entitled to declaratory and equitable relief under the CUTPA. However, because Hope chose to waive any claim for damages and only seeks equitable restitution of ill-gotten profits, dkt. 341, and because damages were available as an adequate remedy at law under the CUPTA, the Court finds and concludes that Hope is not entitled to equitable restitution under the CUPTA.  Sonner, 971 F.3d at 845.

### J.     Conclusions of Law Related to Defendants' Defenses

55.     Defendants pled eight affirmative defenses in their answer.  Dkt. 35.  Five of those claimed defenses, however, are not affirmative defenses.  "[A] defense is an affirmative defense if it will defeat the plaintiff's claim even where the plaintiff has stated a prima facie case for recovery under the applicable law."  Quintana v. Baca, 233 F.R.D. 562, 564 (C.D. Cal. 2005).  If a defense "directly attacks the merits of the plaintiff's case," it is not an affirmative defense.  Id.  The Court concludes that the following defenses pleaded by defendants are not affirmative defenses:

(1) Third Defense: Failure to Mitigate;

(2) Fifth Defense: Acts of Plaintiff;

(3) Sixth Defense: Actions of Others;

(4) Seventh Defense: Lack of Standing; and

(5) Eighth Defense: FDA Authority.

31

1          See <u>Vogel v. Huntington Oaks Delaware Partners, LLC</u>, 291 F.R.D. 438, 442

2   (C.D. Cal. 2013) (lack of standing is not an affirmative defenses); <u>Microsoft Corp. v.</u>

3   <u>Motorola, Inc.</u>, 963 F. Supp. 2d 1176, 1188-89 (W.D. Wash. 2013) (failure to mitigate is

4   not an affirmative defense); <u>578539 B.C., Ltd. v. Kortz</u>, 2014 WL12572679, at *7–8

5   (C.D. Cal. Oct. 16, 2014) (lack of causation and failure to mitigate are not proper

6   affirmative defenses); <u>Surface Supplied, Inc. v. Kirby Morgan Dive Sys., Inc.</u>, 2013 WL

7   5496961, at *3 (N.D. Cal. Oct. 3, 2013) (failure to mitigate is not an affirmative

8   defense).

9         56.    The Court finds that these five defenses, even if treated as affirmative

10  defenses, are without merit.  The Court has found that defendants' unlawful conduct

11  caused Hope's injuries, and it therefore rejects defendants' "acts of plaintiff," "actions of

12  others," and "lack of standing" defenses.  Additionally, defendants fail to explain what

13  conduct by Hope constitutes a failure to mitigate damages beyond stating that Hope did

14  not seek to "obtain[] FDA approval for its Sodium Thiosulfate Injection to treat

15  calciphylaxis."  Dkt. 394.  Defendants have provided no authority as to why Hope's

16  failure to obtain approval for its Sodium Thiosulfate Injection for treating calciphylaxis

17  has any bearing on Hope's ability to recover damages.  The Court notes that during trial,

18  counsel for Fagron admitted that the fact that Hope's Sodium Thiosulfate Injection was

19  approved only for treating cyanide poisoning and the use for dialysis is an off-label use

20  does not affect defendants' obligations under Sections 503A and 503B.  Dkt. 397 at 53-

21  54.  However, because Hope has waived any claims for damages, it does not appear

22  Hope is seeking any relief that is subject to a mitigation defense. Moreover, this Court

23  has already rejected defendants' "FDA Authority" defense, which the Court treats as a

24  defense of preemption.  Dkt. 141.

25        57.    The Court also finds that the defenses of waiver, acquiescence, and estoppel

26  are also without merit.  Waiver requires (1) intentional relinquishment of a known right,

27  (2) knowledge of the known right's existence, and (3) intent to relinquish it.  <u>United</u>

28  <u>States v. King Features Enter., Inc.</u>, 843 F.2d 394, 399 (9th Cir. 1988).  Estoppel requires

that (1) Hope knew the facts, (2) Hope intended its conduct to be acted on by defendants or acted such that defendants had a right to believe that Hope intended its conduct to be acted upon, (3) defendants were ignorant of the true facts, and (4) defendants relied on Hope's conduct to its injury.  Id.  With respect to waiver, the Court finds that defendants have not proved that Hope intended to relinquish any known right.  As for estoppel, the Court finds that defendants have not proved that Hope committed any conduct on which defendants could reasonably rely, that Hope intended its conduct to be relied on, that defendants were ignorant of the facts, or that defendants relied on any of Hope's conduct to its detriment.

58.     Nor has defendant established laches as a defense in this case.  Laches requires proof that (1) Hope unreasonably delayed in filing suit based on when it knew or should have known about defendants' conduct and (2) the delay prejudiced defendants.  AirWair Int'l, Ltd. v. Schultz, 84 F. Supp. 3d 943, 955 (N.D. Cal. 2015). The Court finds that defendants have not proved that Hope unreasonably delayed in filing suit or that defendants were prejudiced by any delay.

59.     Likewise, the defense of unclean hands is not available.  Unclean hands requires proof that (1) Hope's conduct was inequitable and (2) Hope's inequitable conduct relates to the subject matter of its claims.  Pom Wonderful LLC v. Coca Cola Co., 166 F. Supp. 3d 1085, 1092 (C.D. Cal 2016).  Defendants' unclean hands defense rests on its claim that Hope illegally promoted its Sodium Thiosulfate Injection for the off-label use of treating calciphylaxis. The subject-matter of Hope's claims relates to the illegal sale of a drug that has not been approved by FDA for any purpose, not the off-label promotion of an approved drug for unapproved purposes.  Even if off-label promotion could relate to the subject-matter of Hope's claims, the Court finds that defendants have not proved that Hope engaged in any unlawful off-label promotion.  21 C.F.R. § 312.7.

**K.      Conclusions of Law Related to Remedies Sought by Plaintiff**

60.     Hope seeks declaratory relief and injunctive relief under the laws of the five states; disgorgement of defendants' profits under FDUTPA, TCPA, SCUTPA, and CUTPA; and attorneys' fees under the laws of California, Florida, Tennessee, South Carolina, and Connecticut.  The Court finds Hope is entitled to declaratory and injunctive relief.  The Court finds Hope is not entitled to disgorgement nor attorney's fees.

61.     As described below, the Ninth Circuit has held that in federal court, federal law governs whether equitable relief such as equitable restitution can be granted. Sonner, 971 F.3d at 843-845; See also Davilla v. Enable Midstream Partners L.P., 913 F.3d 959, 972–73 (10th Cir. 2019) ("The Supreme Court has concluded that 'State law cannot define the remedies which a federal court must give'. . . .Thus, the practice of borrowing state rules of decision does not apply with equal force to determining appropriate remedies, especially equitable remedies, as it does to defining actionable rights.") (quoting York, 326 U.S. at 105, 65 S. Ct. 1464).

62.     The federal Declaratory Judgment Act governs the availability of declaratory relief in federal court.  In re Adobe Sys., Inc. Privacy Litig., 66 F. Supp. 3d 1197, 1219–20 (N.D. Cal. 2014).  The federal Declaratory Judgment Act authorizes "any court of the United States, upon the filing of an appropriate pleading" to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."  28 U.S.C.A. § 2201(a).

Under the Declaratory Judgment Act, declaratory relief is permitted when there is a "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007) (internal quotation marks omitted); see Adobe, 66 F. Supp. at 1220-23 (permitting declaratory relief claim in a UCL case).

Here, the Court finds that Hope has adequately alleged the existence of an actionable dispute for purposes of the Declaratory Judgment Act as described above.

63.    Hope is thus entitled to a declaration that defendants' conduct violated the UCL, FDUTPA, TCPA, CUTPA, and SCUTPA.

64.    Hope is also entitled to injunctive relief under both federal and state law. The UCL, FDUTPA, TCPA, and CUTPA expressly authorize injunctive relief.  Cal. Bus. & Prof. Code § 17203; Fla. Stat. § 501.211; Tenn. Code. Ann. § 47-18-109(b); Conn. Gen. Stat. § 42-110g(d); see Chowning v. Kohl's Dept. Stores, Inc., 735 F. App'x 924, 924 (9th Cir. 2018) ("[i]njunctions are the primary form of relief available under the UCL") (internal quotation marks omitted) (quoting Kwikset Corp. v. Super. Ct., 51 Cal. 4th 310 (2011))); B.J.'s Wholesale Club, Inc. v. Bugliaro, 2021 WL 1395602, at *4 (Fla. DCA Apr. 14, 2021) ("One of the remedies available under FDUTPA is an injunction."); Roberson, 2006 WL 287389, at *5 ("[A] party who has been or is 'affected by a violation' of the TCPA may bring an action for a declaratory judgment and injunctive relief."); Artie's Auto Body, Inc. v. Hartford Fire Ins. Co., 317 Conn. 602, 623 (2015) ("[CUTPA] provides for . . . injunctive or other equitable relief.").  SCUTPA does not expressly mention injunctive relief, but the Court finds that it authorizes such relief. SCUTPA provides that its remedies "shall be cumulative and supplementary to all . . . remedies otherwise provided by law," S.C. Code § 39-5-160, which this Court reads to incorporate the well-established remedy of injunctive relief.

65.  Moreover, the Ninth Circuit has held that "a state statute does not change the nature of the federal courts' equitable powers." Sonner, 971 F.3d at 842 (quoting Life Assurance Co. v. LaPeter, 563 F.3d 837, 843 (9th Cir. 2009).  Therefore, injunctive relief must also be available under federal law.  "[T]he decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts."  See eBay Inc. v. MercExchange, LLC., 547 U.S. 388, 391 (2006).

66.    "Permanent injunctive relief is appropriate where liability has been established and the plaintiff demonstrates '(1) that it has suffered an irreparable injury;

(2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'" Allergan USA Inc. v. Imprimis Pharm., Inc., 2019 WL 3029114, at *1 (C.D. Cal. July 11, 2019) (quoting Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 156–57 (2010)).

67.     The Court finds that Hope has suffered an irreparable injury.  Defendants' unlawful conduct has cost Hope customers and sales and, in the absence of an injunction, will continue to do so.  Hope and defendants are the only two suppliers of sodium thiosulfate drugs in the United States, which is "a substantial ground for granting an injunction because it creates an inference that an infringing sale amounts to a lost sale" with respect to the other market participant.  Open Text, S.A. v. Box, Inc., 36 F. Supp. 3d 885, 906 (N.D. Cal. 2014).  These injuries—"lost profits and customers, as well as damage to goodwill and business reputation"—constitute "irreparable injury." Sennheiser Elec. Corp. v. Eichler, 2013 WL 3811775, at *10 (C.D. Cal. July 19, 2013); see also Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc., 736 F.3d 1239, 1250 (9th Cir. 2013).

68.     Hope's irreparable injuries cannot adequately be compensated with legal remedies.  See Anhing Corp. v. Thuan Phong Co., 2015 WL 4517846, at *23 (C.D. Cal. July 24, 2015) ("The terms 'inadequate remedy at law' and 'irreparable harm' describe two sides of the same coin. If the harm being suffered by plaintiff . . . is 'irreparable,' then the remedy at law (monetary damages) is 'inadequate.'").  While defendants' past conduct can be repaired through monetary damages in the form of lost profits, defendants' future conduct cannot be repaired through a remedy at law.  Defendants' unlawful conduct has continued since at least the enactment of the 2013 Drug Quality and Security Act amendment to the FDCA (including the Compounding Quality Act), and it is likely to continue in the future absent an injunction.  Such "[c]ontinuous" unlawful conduct "leaves no other adequate remedy for the [p]laintiff aside from

injunctive relief." Daimler AG v. A-Z Wheels LLC, 498 F. Supp. 3d 1282, 1294 (S.D. Cal. 2020); see also MAI Sys. Corp. v. Peak Computer, Inc., 991 F.2d 511, 520 (9th Cir. 1993) ("As a general rule, a permanent injunction will be granted when . . . there is a threat of continuing violations.").

69.    The Court finds the balance of hardships tips in favor Hope.  Defendants' unlawful conduct, if allowed to continue, would cause Hope substantial hardship in the form of lost sales with respect to one of Hope's only three products.  Indeed, Fresenius and DaVita in fact began purchasing Hope's Sodium Thiosulfate Injections for their off-label treatment of calciphylaxis when defendants temporarily stopped selling their sodium thiosulfate drugs.  In contrast to Hope's harm, defendants are not likely to suffer relevant hardship from an injunction.  Although the injunction may cost defendants some sales of its sodium thiosulfate drugs, that will only be true for unlawful sales.  Because the injunction will "enjoin only acts that have already been determined to be unlawful. . . the balance of hardships weighs in favor of issuing a permanent injunction." Oracle USA, Inc. v. Rimini Street, Inc., 324 F. Supp. 3d 1157, 1166 (D. Nev. 2018), vacated in part on other grounds, 783 F. App'x 707 (9th Cir. 2019); see Rodriguez v. Robbins, 715 F.3d 1127, 1145 (9th Cir. 2013) (holding that the government "cannot suffer harm from an injunction that merely ends an unlawful practice").

70.    Finally, the Court finds that the public interest will not be disserved by a permanent injunction.  "[T]here is a public interest in upholding the law and having parties abide by their legal duties." Judge Virginia A. Phillips & Judge Karen L. Stevenson, Federal Civil Procedure Before Trial § 13:76.1 (2019).  The five states have "chosen to pass . . . law[s] that parallel[] federal approval of . . . new drugs" and to "provide[] a limited mechanism for protecting against their distribution and production." Imprimis, 2019 WL 3029114, at *13.  The "public interest is not disserved by enforcing these guidelines . . . to protect patients from the sale and distribution of drugs that are not produced in accordance with applicable requirements." Id.  Additionally, the purpose of

the restrictions on the sale of compounded drugs is to protect the public from the risks of those drugs:

> "[D]rugs compounded by outsourcing facilities have not undergone FDA premarket review for safety, effectiveness, and quality, and lack a premarket inspection and finding of manufacturing quality that is part of the drug approval process. Because they are subject to a lower regulatory standard, compounded drugs should only be distributed to health care facilities or dispensed to patients to fulfill the needs of patients whose medical needs cannot be met by an FDA-approved drug."

FDA Guidance on 503B "Essentially a Copy" Requirement at 9.

The FDA Guidance emphasizes the public safety interest in enforcing the use of compounded drugs only when they are medically necessary. Accordingly, this factor weighs in favor of granting the permanent injunction.

71. The Court thus concludes that Hope is entitled to permanent injunctive relief under the UCL, FDUTPA, TCPA, CUTPA, and SCUTPA.

72. Hope seeks equitable disgorgement of defendants' profits derived from their unlawful sales of sodium thiosulfate drugs under CUTPA, FDUTPA, TCPA, and SCUTPA. Hope does not seek disgorgement of defendant's profits under the UCL.

73. The Court finds and concludes that Hope is not entitled to disgorgement of defendants' profits under the laws of the other four states. Hope is not entitled to disgorgement of defendants' ill-gotten profits because by abandoning its damages claims, Hope has waived its right to seek equitable restitution. See Sonner, 971 F.3d at 845. This is especially the case here where Hope's claim of injury and measure of restitution is based on the sales defendants made which Hope claims would have been made by it but for defendants' unlawful conduct. However, Hope, by waiving a claim for damages, relinquished its claim for recovery of its lost profits based on its own lost sales.

74.     In <u>Sonner</u>, the Ninth Circuit held that in federal court, federal law governs whether equitable relief such as equitable restitution can be granted.  <u>Id.</u> at 843–45. Thus, if a party has an adequate remedy at law such as a claim for damages, that party is not entitled to equitable relief for claims in which an adequate remedy at law exists.  <u>Id.</u> This is true even where under applicable state law, equitable restitution can be awarded without showing that the plaintiff lacks an adequate remedy at law.  <u>Id.</u>

75.     In <u>Sonner</u>, plaintiff asserted claims under the Consumer Legal Remedies Act ("CLRA") and California's Unfair Competition Law ("UCL").  <u>Id.</u> at 838.  The CLRA expressly provided a damages remedy.  <u>Id.</u>  The <u>Sonner</u> plaintiff abandoned her damages claim under the CLRA just prior to trial in an effort to avoid a jury trial.  <u>Id.</u>  In plaintiff's complaint in <u>Sonner</u>, plaintiff never alleged that she lacked an adequate remedy at law.  <u>Id.</u> at 844.  Thereafter, the trial court ruled that the plaintiff had an adequate remedy at law under federal equity principles and she would not be entitled to seek equitable restitution.  <u>Id.</u>  When plaintiff attempted to reverse field, and sought to reassert her CLRA claim, the court denied plaintiff's request.  <u>Id.</u>  The Ninth Circuit affirmed.  <u>Id.</u> at 845.

76.     Similarly, in the present case, Hope disclaimed any claim for damages for purposes of avoiding a jury trial.  Dkt. 341.  As in <u>Sonner</u>, plaintiff had an adequate remedy at law available under the CUTPA, FDUTPA, TCPA, and SCUTPA.[1]  CUTPA §

---

[1]     Hope argues that the legal remedy of damages for its lost profits available under the four state statutes is not an adequate remedy at law because a claim for damages could not compensate plaintiff for loss of goodwill.  Hope relies on <u>Francois & Co., LLC v. Nadeau</u>, No. 5:18-cv-00843-DSF(PLAx), 2019 WL 994402, at *11 (C.D. Cal. Jan. 8, 2019), <u>motion for relief from judgment granted</u>, 334 F.R.D. 588 (C.D. Cal. 2020) for its proposition.  In <u>Francois</u>, plaintiff sought a default judgment for, among other claims, a claim under the UCL, after defendant did not respond to plaintiff's complaint.  When evaluating whether to grant a permanent injunction based on

*(footnote cont'd on next page)*

1   42-110g (providing for recovery of "actual damages"); Fla. Stat. § 501.211(1)-(2)

2   (permitting recovery of "actual damages, plus attorney's fees, and court cost"); Tenn.

3

4
———————————

5   plaintiff's motion for default judgment, the <u>Francois</u> court stated that "plaintiffs have no

6   adequate remedies at law, because monetary damages cannot rectify loss of customers or

7   goodwill." <u>Id.</u> at *11.

8        Hope's reliance on <u>Francois</u> is misplaced.  First, because it arose in the context of

9   a default judgment, the issue was not litigated by the parties.  Next, under the UCL—the

10  claim asserted by the plaintiff in <u>Francois</u>—damages are not an available remedy,

11  whereas here Hope is seeking equitable disgorgement under four state statutes which

12  provide for a damages remedy.  Further, the equitable disgorgement remedy Hope seeks

13  is itself a monetary remedy, and while <u>Francois</u> states that a loss of goodwill cannot be

14  compensated through money damages, the remedy sought by Hope—equitable

15  restitution—would not relate to any prior loss of goodwill independent of any sales lost

16  by Hope.

17       Accordingly, the Court finds and concludes that Hope's loss of goodwill could

18  have been adequately compensated by the legal remedy of damages for lost profits under

19  these states' statutes.  Under these four state statutes, courts may consider a plaintiff's

20  loss of goodwill as part of the damages calculation in determining lost profits. <u>Serv.</u>

21  <u>Jewelry Repair, Inc. v. Cumulus Broad., LLC</u>, 145 F. Supp. 3d 737, 751 (M.D. Tenn.

22  2015) (discussing plaintiff's damages claims under the TCPA by evaluating loss of

23  reputation, business goodwill, attorneys' fees, and lost revenue);  <u>Collins Holding Corp.</u>

24  <u>v. Defibaugh</u>, 373 S.C. 446, S.C.451, 646 S.E.2d 147, 149 (Ct. App. 2007) (explaining

25  that under SCUTPA "recoverable damages include compensation for all injury to

26  plaintiff's property or business . . .").

27       Indeed, plaintiff could have been compensated for its loss of goodwill in its

28  damages calculation if it had not abandoned its damages claim.

Code § 47-18-109(a)(1) (providing a private right of action for recovery of "actual damages"); S.C. Code § 39-5-140(a) (permitting recovery of "actual damages").

77.  Since the CUTPA, FDUTPA, TCPA, and SCUTPA provide actual damages as a remedy, and Hope chose to waive its damages claims when Hope moved to strike defendant's jury demand, dkt. 341, Hope limited its remedies to those that are only equitable in nature.

78.  Restitutionary disgorgement of a defendant's improper profits is an equitable remedy.  "[D]isgorgement of improper profits . . . is a remedy only for restitution[.]"  Tull v. United States, 481 U.S. 412, 424.  And although "[t]he status of restitution as belonging to law or to equity has been ambiguous from the outset," Restatement (Third) of Restitution and Unjust Enrichment § 4(a) (2011), the Supreme Court has "invariably described restitutionary relief as 'equitable'" for Seventh Amendment purposes.  Great-W. Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 229 (2002) (Ginsburg, J., dissenting) (listing cases).  Indeed, "an action for disgorgement of improper profits" is "traditionally considered an equitable remedy."  Tull, 481 U.S. at 424.

79.  In Hope's motion to strike defendants' jury demand, Hope disavowed any claim for damages for its own lost sales and profits.  Dkt. 341.  Based on this waiver, the Court found that Hope may only seek equitable remedies and that Hope's claims do not give rise to a Seventh Amendment right to a jury.  Id.

80.  Moreover, under Sonner, the Ninth Circuit held that, "when a plain, adequate, and complete remedy exists at law . . . federal courts rely on federal equitable principles before allowing equitable restitution in such circumstances. And because [plaintiff] fails to demonstrate that she lacks an adequate legal remedy in this case, we affirm the district court's order dismissing her claims for restitution."  Sonner, 971 F.3d at 845.

81.  Here, because Hope chose to seek disgorgement of improper profits as an equitable restitutionary remedy, when damages were available as an adequate remedy at

41

law under the CUTPA, FDUTPA, TCPA, and SCUTPA, the Court finds and concludes that Hope is not entitled to disgorgement of defendants' ill-gotten profits. The Ninth Circuit's decision in <u>Sonner</u> does not affect Hope's claims for declaratory or injunctive relief because there is no adequate substitute at law for these remedies.

82. Hope is not entitled to recover attorneys' fees under California law. "The court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery." Cal. Code Civ. Proc. § 1021.5. The Ninth Circuit has held that Cal. Code Civ. Pro. § 1021.5, is intended to encourage lawsuits serving a public interest that would not otherwise be brought. <u>See</u> <u>Unocal Corp. v. United States</u>, 222 F.3d 528, 543 (9th Cir. 2000). Even if the suit does serve a legitimate public interest, attorneys fees should not be granted if parties' "own interests are sufficient to motivate" the action. <u>Id.</u> Because Hope pursued this action against Fagron because Fagron's production of its sodium thiosulfate drugs was impacting Hope's sales, it had a sufficient motive to bring suit independent of any public benefit.

**L.      Conclusions of Law Related to the Court's Preliminary Injunction and Hope's Motion for Contempt**

83. Hope claims that the 503B defendants violated this Court's preliminary injunction by continuing to sell their sodium thiosulfate drug without the clinical difference statements by prescribing practitioners required by the preliminary injunction.

84. "[C]ourts have inherent power to enforce compliance with their lawful orders through civil contempt." <u>Cal. Dep't of Soc. Servs. v. Leavitt</u>, 523 F.3d 1025, 1033 (9th Cir. 2008).

85.     As relevant here, the Court preliminary enjoined defendants from "dispensing or distributing any compounded sodium thiosulfate product" from a 503A pharmacy or a 503B outsourcing facility into California, Connecticut, Florida, South Carolina, or Tennessee unless: "(i) defendants are provided an order form for the product; (ii) the order form includes an attestation specifically indicating that defendants' compounded product, which does not contain potassium, will produce a clinical difference; (iii) the attestation specifies that defendants' compounded product, rather than the comparable commercially available drug product, is 'medically necessary' for the patients for whom defendants' drug will be distributed or dispensed; and (iv) the attestation indicates that the attestation is made or approved by a prescribing practitioner."  Dkt. No. 141 at 38–39.

86.     Thus, to comply with the injunction, defendants were required to follow 503B's "essentially a copy" provision. The FDA gives the following examples as acceptable statements of clinical difference:

a.  "a physician who regularly treats patients with an allergy to an inactive ingredient in a particular approved injectable drug product could order a compounded version of the drug for office use from an outsourcing facility provided that he or she includes a statement on the order that removing the particular inactive ingredient produces a clinical difference for his or her individual patients and that he or she will provide the drug only to patients with that particular clinical need";

b.  "Liquid form, compounded drug will be prescribed to patients who can't swallow tablet (if the comparable drug is a tablet)";

c.  "Dilution for infusion solution to be administered to patients who need this formulation during surgery (if the comparable drug is not available at that concentration, pre-mixed with the particular diluent in an infusion bag)";

43

      d.  "1 mg, pediatric patients need lower dose (if the comparable drug is only available in 25 mg dose)".

FDA Guidance on 503B "Essentially a Copy" Requirement at 9.

Moreover, the guidelines explain what would be insufficient as a statement of clinical difference:

      e.  "An order that only identifies the product formulation, without more information, would not be sufficient to establish that the determination described by section 503B(d)(2)(B) has been made."

Id.

87. First, the Court finds that defendants' sales of its sodium thiosulfate drugs following the issuance of the preliminary injunction which were not made pursuant to orders with compliant attestations violated this Court's order. Defendants accepted and filled orders in at least July and August 2020 that were not accompanied by an attestation, provided defendants had in their files an existing, blanket ex ante attestation from the ordering clinic. As such, these sales were in violation of this Court's injunction.

88. Next, the Court finds that the blanket attestations signed by Fresenius accounting personnel after the Court's preliminary injunction was issued do not qualify as clinical difference determinations required by the preliminary injunction, for at least two reasons. First, the preliminary injunction required that each attestation "indicate[] that the attestation is made or approved by a prescribing practitioner." Id. The blanket attestations were not made or approved by a prescribing practitioner. The Fresenius accounting personnel who signed the blanket attestations are not prescribing practitioners for the patients who were to receive the compounded drug, nor did defendants provide evidence that accounting personnel had authorization from the patients' prescribing practitioners to sign the attestations. Moreover, the attestations indicate that they were made on behalf of a practitioner who will administer the compounded drug, and not necessarily the prescribing practitioner. E.g. Exh. 745.

44

Second, the preliminary injunction unambiguously required that each "prescription or order form include" an attestation of clinical difference.  Dkt. No. 141 at 38–39.  A blanket, uniform printed attestation form for multiple clinics did not satisfy this requirement, as these order forms were not accompanied by an attestation.  Unlike the FDA's examples, defendants' attestation forms lack an explanation as to why there is a clinical difference or medical need for a potassium-free product in certain patients.  Id.

89.     However, the Court finds and concludes that defendants undertook steps to comply with the Court's preliminary injunction by (1) requesting attestation forms from individual clinics, (2) seeking to ensure attestations were approved by medical personnel, and (3) modifying the language of their attestation forms.  See Exhs. 864–65; 716; 923.  Defendants' modified attestation form V2020-03 states in relation to a clinical difference statement:

> "The compounded Sodium Thiosulfate injection solution is free of boric acid and potassium chloride compared to comparable commercially available drug products.  In my professional judgement, this compounded product provides clinical and safety benefits relative to the comparable commercially available drug products, which is medically necessary for patients who require this compounded formula."  Exh. 923–215.

Defendants modified the language of the attestation again in V2021-01 to include the phrase: "in the professional judgement of the prescriber . . ." Exh. 923–947.  Defendants testified that they believed that these modified attestation forms complied with the Court's preliminary injunction.

90.     Hope has not provided sufficient evidence to show that defendants acted willfully and knowingly in violating the injunction.  Moreover, defendants have provided evidence that they sought to comply with the Court's preliminary injunction.  "The party alleging civil contempt must demonstrate that the alleged contemnor violated the court's order by 'clear and convincing evidence,' not merely a preponderance of the evidence."  In re Dual-Deck Video Cassette Recorder Antitrust Litigation, 10 F.3d 693, 695 (9th Cir.

1993).  "[A] person should not be held in contempt if his action 'appears to be based on a good faith and reasonable interpretation of the [court's order].'"  In re Dual-Deck, 10 F.3d 693 at 695.

Hope argues that Fagron's conduct after the entry of the preliminary injunction shows that Fagron did not intend to comply with the order.  For example, during trial, Hope relied on Exhibits 703–1, 703–2—an email exchange between Veronica Gwinup, Customer On-Boarding Specialist for Fagron, and Phu Pham, Supervisor of Accounting for Fresenius, dated July 9 and July 17, 2020—and on Exhibit 403—an email exchange between Gwinup and Pham, dated August 6, 2020.  The Court finds that Gwinup's statement in Exhibit 704 that a corporate executive of Fresenius indicated that clinic physicians or managers need to sign the attestations instead of blanket attestations does not show, as Hope argues, that Fagron chose not to comply with the Court's orders for the first five weeks of the injunction and only took action based on their client's wishes.  In Exhibit 703-2, written only a few days after the preliminary injunction was issued, Gwinup states that the Fagron's legal and compliance teams determined the attestations must be signed by someone with clinical authority.  Read together, these exhibits show that Fagron was working to comply with the injunction shortly after it was issued.  Moreover, the Court finds that Gwinup's statement that she hopes that Fagron "can identify an individual that can sign the attestation for each division so [Fagron doesn't] have to have each facility sign one" is expressing Gwinup's hope that she would not have to administer individual attestations and is not an example of Fagron executives' unwillingness to comply.

Because the Court finds that defendants attempted to comply with the injunction, and testified that they believed they had done so, the Court declines to find defendants in contempt.

## IV.   CONCLUSION

In accordance with the foregoing, the Court orders as follows:

1.     Judgment in favor of plaintiff is appropriate.

2.     Plaintiff is entitled to declaratory relief that defendants violated the
FDUTPA, UCL, CUTPA, SCUTPA, and TPCA.

3.     The Court will ISSUE a permanent injunction as follows:

Defendants and their officers, agents, servants, employees, attorneys and all those acting in concert with them, shall be permanently enjoined from directly or indirectly dispensing or distributing any compounded sodium thiosulfate product from a 503B facility into California, Connecticut, Florida, South Carolina, or Tennessee unless:

      a. defendants are provided with an individual clinic order form for the product; and

      b. the order form includes an attestation specifically indicating that defendants' compounded product, which does not contain potassium, will produce a clinical difference; and

      c. the attestation specifies why the defendants' compounded product, rather than the comparable commercially available drug product, is "medically necessary" for the individual patients to whom defendants' drug will be distributed or dispensed; and

      d. the attestation indicates that the attestation is made or approved by a prescribing practitioner of the specified patients; and

      e. an order that only identifies the product formulation, without more information, is insufficient to comply with this injunction.

Plaintiff shall submit a proposed form of judgment in accordance with the foregoing and with the procedures set forth in the Local Rules of Court.

    IT IS SO ORDERED.

Dated: October 26, 2021

_Christina A. Snyder_

Christina A. Snyder
UNITED STATES DISTRICT JUDGE